**HOUSING AUTHORITY OF CITY OF DALLAS, Texas, Appellant,**

v.

**J. T. HUBBELL et al., Appellees.**

No. 15295.

Court of Civil Appeals of Texas.

Dallas.

March 13, 1959.

Rehearing Denied June 26, 1959.

Scurry, Scurry, Pace & Wood, Dallas, for appellant.

Strasburger, Price, Kelton, Miller & Martin, W. M. Taylor, Jr., Royal H. Brin, Jr., and Aubrey J. Roberts, Dallas, for appellees.

DIXON, Chief Justice.

This is an appeal from judgments totalling $906,901.22 in favor of several plaintiffs, all contractors, against the Housing Authority of the City of Dallas, Texas.

Three of the plaintiffs allege that they were associated together in a joint venture under the name of Hubbell-Hubbard Associated Contractors. These three plaintiffs are J. T. Hubbell, an individual doing business as The J. T. Hubbell Construction Company; T. B. Hubbard Construction Co., Inc., a Texas corporation; and Russell W. Nix, an individual. This group will hereafter be referred to as Contractors. A fourth plaintiff C. Russell Lewis, the paint contractor, joined the other contractors in a separate cause of action based on "economic coercion."

The Housing Authority of the City of Dallas is a public body corporate and politic, created under and by virtue of the Texas Housing Authorities Law. Art. 1269k, Vernon's Ann.Civ.St., which is part of Title 28, "Cities, Towns and Villages", of our Statutes. It will hereafter be referred to as Owner.

In 1951 Owner began awarding contracts for the development of a housing project known as Tex. 9–11 to consist of 3,500 dwelling units and to cost approximately $15,000,000. The first three contracts covered the entire project and provided respectively for demolition of existing buildings, grading and construction of foundations. The next seven contracts, awarded in 1952, each covered the construction of approximately 500 dwelling units, these seven construction jobs being designated as Projects Tex. 9–11, A, B, C, D, E, F and G respectively. Thereafter other contracts were awarded, each embracing the entire Tex. 9–11 project, for sewer facilities, underground utilities, electrical distribution, paving, sidewalks, etc.

Contractors were the successful bidders on project Tex. 9–11–C at a contract price of $3,056,948, and on project Tex. 9–11–D at a contract price of $1,854,472. These written agreements will hereafter be referred to as Contract C and Contract D.

The suit sought recovery (1) for $122,416 alleged to have been wrongfully withheld by Owner as liquidated damages because of delay by Contractors in completing performance; (2) for damages for breaches of contract by Owners, said breaches consisting of arbitrary and capricious conduct of Owner (a) in causing delay, and (b) in interfering with Contractors' performance; (3) for extra work not called for in the contract; (4) for damages due to "economic coercion"; and (5) for attorney's fees.

Owner assigns no error to the recovery for extra concrete totalling $12,717.31, or for extra grading costing $1,240.22, and concedes that Contractors are entitled to judgment for these items.

Owner assigns error as to all other items of recovery, praying that the judgment be reversed and rendered as to some items and reversed and remanded as to others.

The trial of this case lasted eleven weeks in the District Court. The Statement of Facts consists of nineteen volumes of testimony and seventeen folios of exhibits. The Transcript is 584 pages in length. Special Issues to the number of 168 were submitted to the jury. Appellant has seriously briefed 73 points on appeal and one "additional point." Though we have labored to avoid prolixity, our opinion cannot be short.

In re: Contractors' Judgment for $143,063.36 as Liquidated Damages Wrongfully Withheld by Owner.

Owner withheld from final payment the sum of $122,416 as liquidated damages for alleged delay of the Contractors in completing performance.

Owner bases its claims for liquidated damages on a provision in Section 13, par. (a) "General Conditions of the Contract" one of several contract documents, which provision is as follows: "(a) * * * The Contractor shall pay to the Local Authority as fixed and liquidated damages (it being impossible to determine the actual damages occasioned by the delay) for each calendar day of delay, until the work is completed, or accepted, or until such time as the Contractor's right to proceed shall be terminated, the amount as set forth in the special conditions, and the Contractor and his sureties shall be liable for the amount thereof. * * *"

Contractors deny the right of Owner to withhold any sum whatever as liquidated damages, basing their contention on another part of Section 13, Par. (a) of the written "General Conditions", which part is as follows: "(a) * * * Provided, that the right of the Contractor to proceed shall not be terminated *or the Contractor charged with liquidated damages* because of any delays in the completion of the work due to unforeseeable causes beyond the control and without the fault or negligence of the Contractor, * * * if the Contractor shall within ten days from the beginning of any such delay * * * notify the contracting officer in writing of the causes of delay, who shall ascertain the facts and extent of delay, and the Local Authority shall, subject to prior approval of the P. H. A., extend the time for completing the work when in its judgment the findings of fact of the contracting officer justify such an extension, and his findings of fact thereon shall be final and conclusive upon the parties hereto." (Emphasis supplied.)

With reference to Contract "C" the jury answered the first twelve special issues as follows: (1) delays, as that word had been defined, prevented Contractors from completing 24 buildings by Oct. 4, 1952; (1–A) 283½ days of such delay occurred in addition to the 129 days extension of time already allowed by Owner: (1–B) delays prevented Contractors from completing 16 buildings by Dec. 8, 1952; (1–C) 283½ days of such additional delay resulted: (1–D) delays prevented Contractors from completing 15 buildings by Feb. 19, 1953; (1–E) 283½ days of such additional delay resulted; (1–F) delays prevented Contractors from completing 10 buildings by March 21, 1953; (1–G) 283½ days of such additional delay resulted; (1–H) delays prevented Contractors from completing 17 buildings by April 17, 19—— under Contract C; (1–1) 283½ days of such additional delay resulted; (3) the withholding by Owner of $76,740 as liquidated damages for the above additional delays was arbitrary and capricious; (4) adverse findings of fact made by the Public Housing Authority's Contracting Officer, Stephenson, in denying Contractors' request for further extension of time were arbitrary and capricious.

In answering Special Issues numbered 5 through 8 the jury made similar findings with reference to the withholding by Owner of $45,676 as liquidated damages under Contract D.

Based on the above jury findings the trial court on October 25, 1956, awarded Contractors a judgment for $122,416 for liquidated damages wrongfully withheld by Owner plus $20,647.36 interest from January 1, 1954, making a total of $143,063.36, such sum to bear interest from date of judgment at the rate of six per cent per annum.

In its charge to the jury the trial court gave this definition: "By the term 'arbitrary and capricious' as the same is used in this charge, is meant willful and unreasoning action without due consideration and in

disregard of the facts, circumstances, and the rights of other parties involved."

The court also gave this definition: "By the term 'delays', as the same is used in this charge means delays in the completion of the work, due to unforeseeable causes beyond the control and without the fault or negligence of the Contractors, including, but not restricted to, the acts of God, or of the public enemy, acts of the Government, acts of the Local Authority, acts of another prime contractor in the performance of a contract with the Local Authority, fires, floods, epidemics, quarantine, restrictions, strikes, freight embargoes, and unusually severe weather or delays of sub-Contractors, due to such causes."

Owner does not contend the judgment awarding Contractors $143,063.36 for wrongfully withholding of alleged liquidated damages should be reversed and rendered. It admits that there is sufficient evidence to authorize time extensions where actual delay resulted from certain causes. But it says that the judgment as to the liquidated damages should be reversed and remanded for retrial under proper submission of issues inquiring as to specific causes and the number of days' delay resulting from each cause.

In its 59th point on appeal Owner asserts that the trial court erred in its definition, as above quoted, of the term "arbitrary and capricious" in connection with certain special issues, including issues Nos. 3, 4, 7 and 8.

Owner objected to the definition because the term "arbitrary and capricious" was not also defined as including and meaning "fractious, whimsical, changeable, not rational, depending on the will alone, tyrannical, despotic, done in bad faith, or a failure to exercise honest judgment"; and for the further reason that the definition as given did not advise the jury that an act is not arbitrary or capricious when exercised honestly and upon due consideration where there is room for two opinions, however much it may be believed that an erroneous conclusion was reached.

We do not agree with Owner insofar as the definition affects issues Nos. 3, 4, 7 and 8. The definition as given includes the terms "willful", "unreasoning action", "without due consideration", "disregard of facts, circumstances, and rights of other parties involved". Surely it cannot fairly be said that Owner may in such manner refuse Contractors' applications for proper extensions of time made pursuant to and in compliance with Sec. 13(a) of the General Conditions, then exact liquidated damages against Contractors on the ground of delay. We overrule Owner's 59th point on appeal in so far as it affects the submission of special issues Nos. 3, 4, 7 and 8.

In its 66th point on appeal Owner says that the Court erred in its definition of the word "delays" and in submitting issues based on such definition. Owner objected to the definition because "the definition did not take into consideration delays which may have delayed completion of a building or group of buildings, without delaying completion of other buildings involved in the construction work or of the entire project, and because the jury was not confined to a consideration of matters which actually delayed completion as distinguished from things which might theoretically delay completion, and because the definition permitted the jury to consider causes of delay which might have been concurrent with other delays which were within the control of the Contractor, and because the definition permitted the jury to consider all of such delays as defined by the Trial Court without restricting the jury or requiring the jury to find as to the specific and alleged causes of delay".

We see no merit in Owner's objections. The definition of "Delays" given by the court follows closely the explanation and meaning of the word as used by the parties in Sec. 13(a) of the "General Conditions." Properly drawn special issues using the word "delays" could limit the scope

of each issue so that the jury's answers would not be subject to the objections levelled by Owner at the definition in question.

■ In its 60th point on appeal Owner alleges that the trial court erred in submitting special issues Nos. 4 and 8. Issue No. 4 (having to do with Contract C) and the jury's answer thereto were as follows: "Do you find from a preponderance of the evidence that the Findings of Fact on the Tex–9–11–C Contract, dated March 10, 1954, and designated in this record as Plaintiff's Exhibit 209, were arbitrary and capricious?" Answer Yes or No. Answer: "Yes". Special Issue No. 8 was the same as Issue No. 4 except that it inquired about findings of fact shown by Exhibit 211 having to do with Contract D.

Exhibit 209, including supporting documents, is more than 70 pages long, so we shall not undertake to copy any substantial part of it here. But an understanding of this controversy requires that we briefly analyze the document.

Exhibit 209 shows numerous occasions during the progress of the work when Contractors pursuant to Sec. 13(a) of the General Conditions asked for extensions of time due to delays alleged not to have been caused by Contractors. These requests were submitted to Owner's architect, who approved them and a form of an order was prepared granting extensions totalling 283½ days in addition to 129 days extension already granted. When this proposed order was submitted for final approval to James L. Stephenson, Contracting Officer for Owner, Stephenson made findings of fact with respect to each application for extension of time. Several applications he approved; others he disapproved.

Below is a summary of the decisions and findings of Stephenson, Owner's Contracting Officer, as shown by Exhibit No. 209.

| Item No. | Date | Cause of Delay | Days of Extension Requested | Decision of Contracting Officer | Reason for Decision |
|---|---|---|---|---|---|
| 1. | 8– 1–52 | Strike of cement truck drivers | 1 | Refused | Application concurrent with another application already granted |
| 2. | 8–18–52 | Cement plant breakdown | 1 | Granted | Cement plant breakdown |
| 3. | 9–19–52 10–19–52 | Fire in Farwell Co. warehouse | 30 | Refused | Fire did not cause any delay for Contractors. |
| 4. | 10–30–52 to 11–19–52 | Plumbers' strike | 21 | Granted | Work on framing 9 buildings was held up by strike |
| 5. | 11–30–52 to 5–19–53 | Intermittent rain | 26½ | ? | No delay due to rain above normal amount of time considered. |
| 6. | 1–16–53 to 4–22–53 | Delay in asphalt tile installation | 98 | Granted as to first 38 bldgs. Refused as to others | Contractors delayed only on first 38 buildings. |

| Item No. | Date | Cause of Delay | Days of Extension Requested | Decision of Contracting Officer | Reason for Decision |
|---|---|---|---|---|---|
| 7. | 3–19–53 to 4–22–53 | Sheet metal workers strike | 44 | Refused | Contractors experienced no delay due to this cause. |
| 8. | 4–10–53 to 8–17–53 | Delay in gas connections | 130 | Refused | Contractors experienced no delay. |
| 9. | 3– 5–53 to 7– 5–53 | Delay in water connections | 122 | Refused | Contractors experienced no delay. |
| 10. | 4–23–53 to 8–17–53 | Patterning of asphalt tile | 116 | Refused | Contractors experienced no delay. |
| 11. | 6–24–52 to 9– 8–52 | Approval of window drawings | 86 | Refused | Contractors experienced no more than 30 days delay which had already been granted. |
| 12. | No date given | Roof material question · | 45 | Refused | No request for time extension within 10 days. |
| 13. | No date given | Separation of time request orders | none | Refused | No additional time requested. |
| 14. | 7– 6–53 to 11–30–53 | Fluctuating water pressure | 137 | Refused | No delay experienced by contractors. |
| 15. | 12–24–52 to 3–14–53 | Fire in Bldg. No. 230. | 120 days on Bldg. No. 230, 15 days on all other Bldgs. in 9–11–C | Approved as to 74 days | 120 days reasonable time to reconstruct burned portion, but 46 days already granted for other causes. 15 days on other bldgs. unreasonable. |
| 16. | 8–17–53 to 8–19–53 | Clean up due to water damages | 3 | Refused | Contractors experienced no delay. |
| 17. | 7–21–52 to 8–21–52 | Grouting of sole plates | 30 | Refused | Contractors experienced no delay. |
| 18. | 8–15–53 to 10–23–53 | Grading of 5 ft perimeter around bldgs. | 69 | Refused | Contractors experienced no delay. |
| 19. | 10–23–53 to 12–23–53 | Roof truss revision | 60 | Refused | Contractors experienced no delay in addition to 45 days already allowed due to this cause. |

| Item No. | Date | Cause of Delay | Days of Extension Requested | Decision of Contracting Officer | Reason for Decision |
|---|---|---|---|---|---|
| 20. | No Specific date given | Inaccessibility of site | 60 | Refused | Request for delay caused by another contractor cannot be recognized as valid claim. |
| 21. | 4– 7–52 to 8–15–52 | Steel strike | 112 | Refused | Contractors experienced no delay due to this cause. |
| 22. | 7– 2–52 to 8–18–53 | Grading operations | 390 | Refused | Contractors experienced no delay due to this cause. |

Owner objected to the submission of Special Issue No. 4 on the grounds that (1) said issue is duplicitous and multifarious in that it inquires as to all of the various findings of fact shown in Exhibit 209 considered together without inquiring as to each finding; and (2) if the jury should answer that the findings were arbitrary, and capricious (which the jury did) such answer would in effect be finding that Owner's Contracting Officer acted arbitrary and capriciously in granting some of Contractors' applications.

Owner's objections to Special Issue No. 4 are well taken. The 22 items of findings and decisions listed above are independent of each other. We think the conclusion is inescapable that a separate answer to each application is necessary before a correct tabulation can be made of the total number of days' delay for which Contractors were entitled to extensions of time. It is to be noted that the Contracting Officer granted the extensions of time requested on Items Nos. 2 and 4, and in part granted extensions requested on Items Nos. 6 and 15. The answer of the jury to the issue as submitted in effect says that the findings favorable to Contractors were arbitrary and capricious, as well as the findings unfavorable to Contractors.

This is not a situation in which a global submission of issues is permissible. Con-tractors in attempting to uphold the submission of Issue No. 4 in the form in which it was given cited these authorities: Jones v. Scott, Tex.Civ.App., 266 S.W.2d 534; City of Houston v. Lurie, 148 Tex. 391, 224 S.W.2d 871, 14 A.L.R.2d 61; Howell v. Howell, 147 Tex. 14, 210 S.W.2d 978; Texas General Indem. Co. v. Scott, Tex. Civ.App., 246 S.W.2d 228; Masterson, "Special Issues in Texas", 6 S.W.L.J. 163, 169; Harvin, "Ultimate or Controlling Issues in Texas", 25 T.L.R. 391.

In our opinion the cases cited by Contractors are not in point with the facts of this case. For example in the Howell divorce case the plaintiff pled and offered testimony as to several alleged acts of cruel treatment. The jury could have believed that some of the alleged acts never occurred, yet could answer the issue in the affirmative if it believed that any one of them had occurred. No such situation is presented in the case now before us with reference to Special Issue No. 4. This subject is discussed in an opinion by Justice Garwood of our Supreme Court in Roosth & Genecov Production Co. v. White, 152 Tex. 619, 262 S.W.2d 99 (Syl. 4); and by this Court in Newton v. Town of Highland Park, Tex.Civ.App., 282 S.W.2d 266 (Syl. 11).

What we have said about Special Issue No. 4 is true also of Special Issue No. 8, we sustain Owner's 60th point on appeal.

In its 67th point on appeal Owner attacks the submission of Special Issues Nos. 1, 1–B, 1–D, 1–F, 1–H, 5 and 5–B.

In its 68th point Owner similarly attacks submission of issues Nos. 1–A, 1–C, 1–B, 1–G, 1–1, 5–A and 5–C.

Issue No. 1 inquired whether delays prevented Contractors from completing 24 buildings by Oct. 4, 1952, under Contract C. Issue No. 1–A inquired how many days of such delay there were in addition to the 129 days' delay for which extensions of time had already been granted.

The other issues involved in Owner's 67th and 68th points were identical with Issues Nos. 1 and 1–B except that they inquired as to different groups of buildings and different completion dates.

Owner objected to the submission of Special Issue No. 1 on the ground that: " * * * it did not take into consideration the time extensions granted by change orders which were agreed to between the Owner and the Contractor, nor the additional time extensions granted by the Owner to the Contractor; and further, because said issue as submitted was not a controverted issue, in that the 129 days time extension had already been granted extending the time completion on the first twenty-four buildings 129 days beyond October 4, 1952; and further because said issue was duplicitous and multifarious in that it permitted the jury to consider any and all of the alleged causes of delay, including alleged causes of delay about which there was no written notice to the owner, and no written request for an extension of time in accordance with the provisions of the contract."

Owner objected to the submission of Special Issue No. 1–A on the grounds that: " * * * said issue was multifarious and duplicitous in that it required the jury to find a number of days for all of the alleged delays inquired about, without inquiring as to the number of days delayed by each of each of the alleged causes; and further because said issue took into consideration the

129 days already granted by time extension but did not take into consideration the additional time extensions granted by the Owner to the Contractor by the change order dated March 10, 1954."

The record discloses that Owner and Contractors during the progress of the work had agreed on time extensions totalling 129 days for performance of Contract C and 9 days for performance of Contract D.

In our opinion Owner's objections are good. What we have said in our discussion of Owner's 60th point on appeal is applicable here too, so we shall not repeat the discussion. Somewhere in the charge to the jury individual delays and the cause of each must be submitted to the jury in a manner which will enable the jury to determine each cause of delay, whether Contractors took proper and timely steps as provided in the contract to obtain extensions of time in each instance, and the number of days delay caused in each instance. Further, the delays and causes which would justify extensions of time for performance should not be concurrent. For example, and speaking hypothetically, if one delay of 10 days time should be found to have resulted from 100 different causes, Contractors would not be entitled to a time extension of 1,000 days. We sustain Owner's 67th and 68th points on appeal.

In re: $253,000 Judgment for Contractors as Damage for Delays Caused by Owner:

The jury found that due to delays caused by Owner, damage had been suffered by Contractors in the amount of $151,314.37 under Contract C, and $102,-095.85 under Contract D, a total of $253,-410.18.

In its 1st point on appeal Owner says that the trial court erred in overruling Owner's motion for instructed verdict as to Contractors' claim for damages in view

of the "exculpatory provision" of the contracts.

The "exculpatory provision" or "no-damage-for-delay" provision referred to in Owner's 1st point is to be found in Sec. 13 of the General Provisions and includes the following: "(b) no payment or compensation of any kind shall be made to the contractor for damages because of hinderance or delay from any cause in the progress of the work, whether such hinderances or delays be avoidable or unavoidable."

The jury in answer to special issues found with reference to Contract C that eleven separate acts or failures to act on the part of Owner caused delays to Contractors. These eleven findings (as set out in Owner's brief) were as follows: "(1) Failure to plan development and construction of whole project; (2) Failure to furnish master progress schedule; (3) Failure to coordinate work of various prime contractors; (4) Failure to proceed with underground utilities contract until August 1, 1952; (5) Failure to proceed with the sidewalks contract until July 1, 1953; (6) Failure to expedite flow of information; (7) Failure to decide on type of water heaters; (8) Failure to deliver water heaters; (9) Arbitrary and capricious requirements of Architects; (10) Instructions to asphalt tile sub-contracts; (11) Refusal to accept the buildings within reasonable time after August 25, 1953."

The same findings were made by the jury with reference to Contract D.

It will be recalled that in Owner's 59th point the definition of "arbitrary and capricious" as given in the Court's charge was attacked as incorrect in its application to Special Issues Nos. 3, 4, 7 and 8, relating to the question whether Contractors were liable for liquidated damages under the terms of the Contracts. We overruled the 59th point insofar as the definition applied to those particular issues. But Owner also attacks the definition as incorrect in its application to Special Issues Nos. 13–A and 23, which had to do with damages assessed against Owner in favor of Contractors, and which inquired whether Owner's architects made arbitrary and capricious requirements as to the construction of the buildings. The definition must be studied in a different light when considered in connection with Special Issues Nos. 13–A and 23, for these issues had to do with the question whether Owner was liable to Contractors for delays caused by Owner despite the "exculpatory" or "no-damage-for-delay" provision relied on by Owner.

Owner contends that under the "no-damage-for-delay" provision of the contracts, heretofore quoted, Sec. 13(b) of the General Conditions, there can be no liability on the part of the Owner for delays unless it is found that the delays were caused by Owner fraudulently, or in bad faith, or with willful intent to injure Contractors. In support of this contention Owner cites and quotes from these authorities: Wells Bros. Co. of New York v. United States, 254 U.S. 83, 41 S.Ct. 34, 65 L.Ed. 148; Wood v. United States, 258 U.S. 120, 42 S.Ct. 209, 66 L. Ed. 495; Hansen v. Covell, 218 Cal. 622, 24 P.2d 772, 89 A.L.R. 670; Underground Construction Co. v. Sanitary District of Chicago, 367 Ill. 360, 11 N.E.2d 361, 115 A.L.R. 57; Merchants Loan & Trust Co. v. United States, 40 Ct.Cl. 117; City of Orlando v. Murphy, 5 Cir., 84 F.2d 531; Psaty & Fuhrman v. Housing Authority of the City of Providence, 76 R.I. 87, 68 A.2d 32, 10 A.L.R.2d 789; and A. Kaplen & Sons, Limited v. Housing Authority of City of Passaic, 42 N.J.Super. 230, 126 A.2d 13. Owner further contends that Contractors' remedy, and their only remedy, for delays not caused by Contractors, is to apply for extensions of time within ten days of each delay, as provided in Sec. 13(a) of the "General Provisions".

Contractors counter that the jury's findings in Special Issues Nos. 13–A and 23, to the effect that Owner's Architects made arbitrary and capricious requirements of Contractors, were sufficient to take the de-

lays out of the "no-damage-for-delay" provisions of the Contract.

In support of their position Contractors cite Northeast Clackamas County Electric Co-Operative, Inc. v. Continental Casualty Co., 9 Cir., 221 F.2d 329; Pitt Const. Co. v. City of Dayton, 6 Cir., 237 F. 305; O'Connor v. Smith, 84 Tex. 232, 19 S.W. 168; City of Dallas v. Shortall, Tex.Civ. App., 87 S.W.2d 844 (rev. on other grounds 131 Tex. 368, 114 S.W.2d 536).

Owner's reply to Contractors on this point is that the definition given by the Court of "arbitrary and capricious" is defective when applied to Special Issues No. 13–A and 23 because the definition does not include the elements of fraud, bad faith, or willful intent to injure Contractors, or the equivalent of such elements. Owner objected to the definition as given in the charge. (See our discussion of Owner's point on appeal No. 59 under the liquidated damages part of this opinion.)

In our opinion the definition of "arbitrary and capricious" as given by the court was sufficient when considered in connection with Special Issues No. 13–A and 23; and was sufficient to cast liability on Owner for delays found to have been caused by Owner arbitrarily and capriciously notwithstanding the "no-damage-for-delay" provision of the contract, Sec. 13(b) of the "General Conditions." The terms "willful and unreasoning action", "without due consideration", "disregard of the rights of other parties" seem to us to impart bad faith. Cimarron Ins. Co. v. Pace, 212 Ga. 427, 93 S.E.2d 593; Rasmussen v. Moe, 138 Cal.App.2d 499, 292 P.2d 226; Nat. Labor Relations Board v. Knoxville Publishing Co., 6 Cir., 124 F.2d 875; Fenner v. American Surety Co., Tex.Civ.App., 156 S.W.2d 279. The "no-damage-for-delays" provision was intended to protect Owner from damages for delays caused by others than Owner, and was intended also to protect Owner from damages for delays caused by Owner itself even if such delays were due to Owner's negligence and mistakes in judgment. But the "no-damage-for-delay" provision did not give Owner a license to cause delays "willfully" by "unreasoning action", "without due consideration" and in "disregard of the rights of other parties", nor did the provision grant Owner immunity from damages if delays were caused by Owner under such circumstances. We overrule Owner's 1st point on appeal, and its 59th point with reference to Special Issues Nos. 13–A and 23.

Owner in 17 separate points numbered 39 to 55, inclusive, alleges error in submitting Special Issues Nos. 9, 10, 11, 11–A, 11–B, 11–C, 11–D, 12, 12–A, 12–B, 13–A, 13–B, 14–A, 14–B, 15, 15–A, and 15–B, all of which issues were answered by the jury in favor of Contractors. In order to conserve space we have prepared a chart setting forth certain information concerning these 17 points on appeal, and also concerning four other points, Nos. 35, 36, 37 and 38.

| Point on appeal | Directed toward Special Issues Nos. | Subject matter Special Issues | Grounds of Owner's objection |
|---|---|---|---|
| 39 | 9 | Whether Owner failed to plan development of the whole project 9–11 so that Contractors would be able to complete contracts within time schedule for certain groups of buildings. | Duplicitous, multifarious permitted jury to speculate as to development and construction of whole project rather than limiting issue consideration to Contract C; and failed to take into consideration 129 days extension already granted, and additional time extension shown in Exhibit 209. |
| 40 | 10 | Whether failure of Owner to furnish Master progress schedule prevented Contractors from proceeding with Contracts in orderly, efficient and economical manner. | Already submitted in Issue No. 9. |
| 41 | 11 | Whether Owner failed to coordinate work of various prime contractors (including demolition, grading, foundation, sanitary sewer, underground utilities, electrical distribution, paving community sidewalks and clothes poles contracts) with Contract C. | Duplicitous, multifarious, without inquiring as to failure to coordinate work of each prime contractor. Charge on weight of evidence, assuming necessity of coordinating all of said prime contractors with Contract C, though it was not necessary in some instances. |
| 42 | 11-A | Whether above failure to coordinate work of prime contracts delayed Contractors in completion of Contract C. | Comment on weight of evidence; multifarious. |
| 43 | 11-B | Whether failure of Owner to proceed with underground utilities until Aug. 1, 1952 delayed Contractors in completing their contracts. | Duplicitous; repetition of matters inquired about in Issues Nos. 11 and 11-A, comment on weight of evidence that it assumes duty of Owner to proceed prior to date named. |

| Point on appeal | Directed toward Special Issues Nos. | Subject matter Special Issues | Grounds of Owner's objection |
|---|---|---|---|
| 44 | 11-C | Whether failure of Owner to proceed with sidewalks and clothes poles contracts until July 1, 1953 delayed Contractors in completing their contract. | Same as objection to Issue No. 11-B. |
| 45 | 11-D | Whether Owner failed to expedite flow of information to Contractors so as to minimize delays in performance. | Duplicitous, multifarious; general charge in that it inquired about various items without confining jury to any particular item; permits jury to speculate as to meaning of expedite; comment on weight of evidence in that it assumed that if Owner expedited information it would minimize delay, assumes there was delay. |
| 46 | 12 | Whether Owner failed to decide on type of water heater within a reasonable time. | Duplicitous, multifarious in that it inquired whether Owner failed to decide as to type of water heater and also whether such decision was made within reasonable time; also repetition of matters inquired about in Special Issue No. 11-D. |
| 47 | 12-A | Whether failure of Owner to decide on type of water heater delayed performance by Contractors. | Failure to decide on type of water heater was item of information included in Special Issue No. 11-D. |
| 48 | 12-B | Whether Owner failed to *deliver* water heaters in such time that Contractors would not be delayed. | Duplicitous, and multifarious, also permitted jury to speculate that delay would be in installation of water heaters, rather than delay in completing buildings. |

| Point on appeal | Directed toward Special Issues Nos. | Subject matter Special Issues | Grounds of Owner's objection |
|---|---|---|---|
| 49 | 13-A | Whether Owner through its Architects made arbitrary and capricious requirements as to construction of buildings. | Multifarious in that it submits many and various issues as to many requirements such as installation of cripples and gerts, adzing joists, straigthening studs, caulking, grading, etc., without restricting jury to any particular requirement. |
| 50 | 13-B | Whether such arbitrary and capricious requirements delayed Contractors. | Multifarious; permitted jury to all requirements regardless of Contractors' failure to give notice and ask extension of time as to some of alleged causes of delay. |
| 51 | 14-A | Inquiring as to instructions by Owner to Contractors' subcontractors with reference to laying of asphalt tile. | Comment on weight of evidence in that it assumed that the instructions were not authorized under terms of Contract and there was no evidence that Contractors protested in writing as to such instructions. |
| 52 | 14-B | Whether such instructions to asphalt tile subcontractor delayed performance by Contractors. | Does not inquire as to delay as to certain buildings or groups of buildings; does not inquire as to what delays or number of days delays; uncontroverted evidence shows no delay resulted. |
| 53 | 15 | Whether buildings were substantially completed by Aug. 25, 1953 . | Not supported by pleadings or evidence; not ultimate issue; duplicitous and multifarious; no definition of "substantially completed." |

| Point on appeal | Directed toward Special Issues Nos. | Subject matter Special Issues | Grounds of Owner's objection |
|---|---|---|---|
| 54 | 15-A | Whether Owner refused to accept buildings within a reasonable time after Aug. 25, 1953. | Uncontroverted evidence shows buildings were accepted within reasonable time after Aug. 25, 1953; were accepted as soon as ———————— list of corrections were made in buildings by groups. |
| 55– | 15-B | Whether refusal to accept buildings within a reasonable time after Aug. 25, 1953 was arbitrary and capricious. | Contrary to overwhelming weight of evidence. |

*(note) Four other points.

* Special Issues Nos. 9 to 15–B, inclusive, had reference to Contract C. Special Issues Nos. 19 to 25–B, inclusive, were identical with Issues Nos. 9 to 15–B except that they had reference to Contract D. Owner levelled the same objections to their submission.

| Point on appeal | Directed toward Special Issues Nos. | Subject matter Special Issues | Grounds of Owner's objection |
|---|---|---|---|
| 35 | 16 | Whether acts or failures, if any found by jury in answer to Special Issues Nos. 9, 10, 11-A, 11-B, 11-C, 11-D, 12-A, 12-B, 13-B, 14-B and 15-B caused completion of Contract C to be delayed beyond 129 days allowed by time extension orders. | Multifarious; permitted jury to consider all of said acts with regard to how much delay each of said acts or failures caused; and without regard to whether some of said acts or failures were concurrent with others; failed to take into consideration additional time granted by Owners as shown by Exhibit 211. |
| 36 | 25-C | Whether acts or failures to act found in answer to Special Issues Nos. 19, 20, 20-B, 20-C, 20-D, 21, 22-A, 22-B, 23-A, 24-A, and 25-B caused completion of Contract D to be delayed beyond 9 days allowed by time extension orders. | Same as objections to Issue No. 16. |
| 37 | 18 | What amount of money would compensate contractors for damages as result of acts or failures found by the jury in answer to Special Issues Nos. 9, 10, 11-A, 11-B, 11-C, 11-D, 12-A, 12-B, 13-B, 14-B and 15-B. Jury answered $151,314.37. | Multifarious. |
| 38 | 26-A | What amount of money would compensate Contractors for damages as result of acts or failures found by jury in answers to Special Issues Nos. 19, 20, 20-A, 20-B, 20-C, 20-D, 21, 22, 22-A, 22-B, 23, 23-A, 24, 24-B, 25 and 25-B. Jury answered $102,095.81. | Same as objections to Issue No. 18. |

We sustain the following points of error: the 35th, 36th, 39th, 40th, 41st, 42nd, 45th, 48th, 49th and 50th, because the issues are multifarious; 37th and 38th because they cannot stand in view of our holding in regard to the issues immediately preceding them; 51st and 52nd, because the issues assume instructions were not authorized; and 53rd because no definition of "substantially completed" was given. Owner's 43rd, 44th, 46th, 47th, 54th, and 55th points of error are overruled.

### Interference With Poteet:

The judgment against Owner included the sum of $169,512.80 on Contract C and $57,351.88 on Contract D, a total of $226,864.48 for alleged interference by Owner with the performance of his carpentry contract by B. H. Poteet, a subcontractor.

This award was based on the jury's answers to Special Issues Nos. 55 to 59, inclusive; and 134 to 136, inclusive. These answers and the numbers of the issues were as follows: Owner's architects interfered with the performance by Poteet of his subcontract under Contract C (55); the interference with Poteet's performance of his subcontract under Contract C contributed to Poteet's failure to perform his subcontract under Contract D (58); such interference contributed to the failure of Poteet to complete performance of his subcontracts under Contract C and Contract D; (56 and 58); to Contractors' damage in the sum of $169,512.80 under Contract C (57), and $57,351.88 under Contract D (59); the carpentry work performed by Poteet was defective (134), which defects were corrected by Contractors after Poteet left the job (135); said correction did not delay Contractors in the completion of Contract C (136).

In connection with Special Issue No. 55 the court submitted this definition: "By the term 'interfered with' as used in the foregoing Special Issue is meant all invasions of contract relations including but not limited to any act which delayed and made more difficult or prevented performance or made performance of less value to plaintiff Contractors, including but not limited to arbitrary and unreasonable requirements and demands for work which were neither contemplated nor intended by the contracts, if any, or arbitrary and unreasonable interpretations of the plans and specifications."

In six points on appeal, Nos. 2, 3, 56, 57, 58 and 69, Owner has assailed this part of the judgment. These points are that the Court erred in overruling Owner's motion to disregard the answers to Issues No. 57 and 59, and to render judgment non obstante veredicto in view of the answers to Issue No. 134; in overruling Owner's motion for instructed verdict as to claims for damages due to Poteet's failure to perform his subcontracts; in submitting Issues Nos. 55 to 59, inclusive; in rendering judgment based on the answers to Issues Nos. 57, 59, 63, 66, 69, 72, 74, 94 and 97 because such judgment allows a double recovery; and in rendering judgment based on Issues Nos. 18, 26–A, 57 and 59 because such judgment allows a double recovery.

In connection with the submission of Issue No. 55, Owner objected to the Court's definition of the term "interfered with" because the definition permits the jury to consider *all* alleged acts and invasions of contract relations which may have delayed Contractors, or made performance more difficult, or prevented performance, or made performance of less value and does not instruct the jury that such acts and invasions must be wrongful, intentional, and willful acts, calculated to do damage, and done with the unlawful purpose of causing damage without right or justifiable cause.

In our opinion the definition given by the court was not correct because it failed to include the elements of intentional and willful acts, calculated to cause damage to Contractors, and done with the unlawful purpose of causing damage and loss, without right or justifiable cause on the part of Owner. Lytle v. Galveston, H. & S. A. R. Co., 100 Tex. 292, 99 S.W. 396, 10 L.R.A, N.S., 437; Raymond v. Yarrington, 96 Tex.

443, 73 S.W. 800, 62 L.R.A. 962; Terry v. Zachry, Tex.Civ.App., 272 S.W.2d 157; 25 Tex.Jur. (Sec. 3); 15 R.C.L. 63; 13 Tex. Law Rev. 145.

We think that Issue No. 55 in the form it was submitted was improper in that it did not limit the jury to any particular acts of Owner which constituted interference, but undertook a "global" submission by including in one issue *all* of the alleged acts of interference by Owner and its architects. Since interference is a tort, 93 A.L.R. 1133, Issues Nos. 56 and 58 were improper in that they inquired merely whether Owner's interference *contributed* to Poteet's failure, but did not inquire whether said interference was a proximate cause of said failure. 25 Tex.Jur. 39; 30 Am.Jur. 82. It follows that Issues Nos. 57 and 59, the damage issues, cannot be allowed to stand. It is undoubtedly true as a matter of law that an Owner can render himself liable for damages by interference with contractual relations between contractor and subcontractor. American Surety Co. of New York v. Shaw, Tex.Com. App., 69 S.W.2d 47. But we do not agree with Owner that it was entitled to an instructed verdict here or a judgment non obstante veredicto as to the Poteet phase of the judgment because of the jury's answer to Issue No. 134 to the effect that the carpentry work performed by Poteet was defective. It is undisputed that some of Poteet's work was defective, but there is evidence that not all of it was defective. Owner was certainly not liable for interference in those particular instances when its architects required Poteet to do his work properly, or when the architects made him correct defective work. But did Owner interfere with performance by Poteet of part or all of that portion of Poteet's work, if any, which was not defective? The jury's verdict does not answer the question. The answers to Issue No. 134 cannot be accepted as conclusive on the Issue. In so holding we, of course, do not pass on the question whether the evidence in another trial may be conclusive on the point.

We sustain Owner's 56th, 57th, 58th and 69th points on appeal. We overrule the 2nd and 3rd points on appeal.

### Judgment of $163,449.79 for Contractors for Extras.

The jury in answers to Issues No. 60 to 77, 84 to 98 and 104 to 108, inclusive, found damages in favor of Contractors for extra work, and judgment was rendered therefor as follows:

| | Contract "C" | Contract "D" | Total |
|---|---|---|---|
| Laying concrete slabs. | $8,961.16 | $3,756.15 | $12,717.31 |
| Cripples & Girts | 12,563.47 | | 12,563.47 |
| Joists & sub-floors | 1,228.28 | 3,273.19 | 4,501.47 |
| Grouting sole plates | 6,312.50 | | 6,312.50 |
| Wedging & blocking | 4,151.65 | | 4,151.65 |
| Cutting holes in sub-floor | 2,770.00 | 1,560.00 | 4,330.00 |
| Reframing | 41,793.22 | 15,456.43 | 57,244.65 |
| Insulating pipe | 21,494.63 | 13,684.75 | 35,179.38 |
| Grading | 686.41 | 553.81 | 1,240.22 |
| Plus interest of 23,589.72 | | | 23,589.72 |
| Grand total of judgment for extras | | | $163,449.79. |

In points of error Nos. 17 to 29, inclusive, Owner challenges the submission of Issues Nos. 61, 64, 67, 70, 73, 84, 86, 90, 93, 104 and 106. Each of the issues inquired whether certain work constituted extra work. The jury answered each of

the issues in the affirmative. Owner objects to the submission of each issue on the ground that it submitted a question of law.

As a sample we copy Issue No. 70: "Do you find from a preponderance of the evidence that the wedging and blocking 1X4 furring on 21 buildings under Tex. 9–11(c) contract constituted extra work, as that term has been defined herein?"

In its point No. 32 Owner objects to the court's definition of the term "extra work", which definition was as follows: "By the term 'extra work' as the same is used in this charge, is meant additional work and labor done and additional materials furnished by plaintiff-Contractors, which was not required in the performance of the Contract, plans and specifications in question."

We agree with Owner that each of the issues as drawn submits a question of law, or at least a mixed question of law and fact. Each issue and the definition call on the jury to interpret the written contract, including the plans and specifications. The plans consist of 55 blueprint pages, 39 of which contain details of the work to be done by Contractors. The specifications contain 70 pages of instructions to bidders, general conditions, special conditions, and scope of work; 65 pages of detailed specifications covering various phases of the work; 30 pages covering plumbing, heating, electrical and mechanical work; and 13 addenda.

It has been held that to ask a jury whether a contractor erected a building in accordance with the contract is to ask the jury a question of law. Hewitt v. Buchanan, Tex. Civ.App., 4 S.W.2d 169; Brammer & Wilder v. Limestone County, Tex.Civ.App., 24 S.W.2d 99; Schoenberg v. Forrest, Tex. Civ.App., 228 S.W.2d 556; Phillips v. Burns, 151 Tex. 614, 252 S.W.2d 927. Substantially the same question is presented here. To ask the jury whether certain work was extra work is to ask the jury whether said work was required to be done as part of Contractors' obligation in the performance of the contract, or whether

the work was not required by terms of the contract, but was in addition to the work required by the contract. Thus the jury is called on to interpret the written contract.

It has been held that in some instances an issue which might otherwise be objectionable because it presents to the jury a mixed question of law and fact, has been cured of the error by reason of appropriate accompanying explanations and definitions. 41–B Tex.Jur. 505. But we cannot for that reason accept the issues here under attack. The court's definition of "extra work", which we have quoted, merely refers the jury to the contract and by the terms of the definition itself calls on the jury to interpret the contract,—that is, it asks the jury to decide whether the work in question was additional work "which was not required in the performance of the Contract, plans and specifications." Thus the question of law in the issues as submitted is not rendered harmless by the definition. To the contrary, it is actually carried forward and emphasized in the definition.

We sustain Owner's points of error Nos. 17 to 29, inclusive, and No. 32.

■■■ In its 4th to 9th points, inclusive, and its 11th point Owner says that the court should have disregarded the jury's findings and should render judgment non obstante veredicto, as to extra cripples and girts, adzing and reworking joists, and insulating pipe, because Contractors failed to protest and did not present any claims for such items until after the contract was completed. In its 63rd point Owner says that for the same reason testimony should not have been admitted as to certain causes of delay. In its 10th point Owner says it should have had an instructed verdict as to Contractors' claim for insulating pipe.

In support of its position Owner relies on Sec. 11 of the General Conditions, as follows: "(a) If the contractor claims that any instructions by drawings or otherwise involve extra cost or extension of time, he shall within ten days after the receipt of such instructions, and in any event before proceeding to execute the work, submit his

protest, thereto in writing to the Local Authority, stating clearly and in detail the basis of his objections. No such claim shall be valid unless so made."

Owner also relies on Sec. 15, which provides that all disputes, whether involving law or fact, or both, or extra work, or time extension, or breach of contract, must be presented in ten days of the commencement of suit, and any claim not so presented is waived.

Owner also contends that the alleged items of extra work were either called for in the plans and specifications, or were necessary to correct defects so that the work would conform to the plans and specifications.

We do not doubt that the provisions in the contract requiring Contractors to give written notice of claims for extras and time extensions are valid. However, as asserted by Contractors, under some circumstances, the notice need not be given— for instance when an Owner by its actions might be held to have waived the provisions requiring such written notice. Wright v. King, Tex.Civ.App., 17 S.W.2d 98. Moreover Contractors seek to recover on the theory of quantum meruit rather than on the written contract. Collins v. Hall, Tex. Civ.App., 161 S.W.2d 311; Allegeny County Housing Authority, for Use of Dobson v. Caristo Const. Corp., D.C., 90 F.Supp. 1007. In any event we cannot render this part of the judgment in Owner's favor as Owner's 4th to 11th points would have us do, because this portion of Contractors' cause of action is indivisible from other portions which we have already decided must be reversed and remanded. Fisher v. Coastal Transport Co., 149 Tex. 224, 230 S.W.2d 522. Owner's 4th to 11th points, inclusive, and its 63rd point are overruled.

In its 14th and 15th points Owner contends that the court erred in rendering judgment based on the jury's answers to Issues Nos. 18, 26–A, 57, 59, 63, 69, 72, 74, 77, 92, 94 and 97, because said answers allow Contractors to obtain a double recovery.

Undoubtedly there were overlaps in Contractors' claims. Lippincott, a witness offered by Contractors, testified as to 12 overlaps. Some adjustments were made in an effort to eliminate these overlaps and double recoveries. Contractors say that the claims in regard to Poteet were reduced $133,000 in order to eliminate the overlaps of the Poteet claims with other claims, such, for example, as the claims for extra cripples and girts. At the back of their first supplemental brief Contractors present an elaborate chart in which they undertake to demonstrate that all double recoveries have been eliminated.

The alleged double recoveries are too numerous to be listed or described here. Owner contends that many double recoveries have not been eliminated by the adjustments. Contractors take the contrary view. But Contractors admit that it is virtually impossible in a case of this kind, with the different theories of recovery involved, to have eliminated or to have prevented some of the duplications of which Owner complains. The duplications, according to Contractors, do not exceed $55,633.62, and could be taken care of by requiring a remittitur of that amount.

To audit the many claims and to ferret out the duplications is a task which we shall not undertake. Owner's 14th and 15th points are sustained.

### Judgment In Re: Paint Job:

A judgment for $60,113.41 was awarded jointly to C. Russell Lewis and the other Contractors for an additional coat of paint which Owner claims Contractors agreed to apply free of charge.

The specifications called for the application on all buildings of one coat of silicate texture paint of a quality equal to either Brocado or Sherwin-Williams paint. Later, after Contract C had been signed but before Contract D was signed, the specifications were amended so that if Brocado paint should be used, two coats must be applied. However, the specifications still provided that only one coat of Sherwin-Williams paint need be applied.

The first paint subcontractor had given up the job after having painted several buildings, and C. Russell Lewis took over as paint subcontractor. A controversy soon developed. Lewis undertook to apply one coat of Sherwin-Williams paint. Owner's architects refused to accept the work.

After extended negotiations Lewis, the subcontractor, wrote a letter dated April 24, 1953, to the prime Contractors in which he proposed to furnish a paint finish consisting of one spray coat of T & P silicon stippled texture, and one coat of Jones-Blair Satin, rubber base paint, or its equal. This letter is the focal point in the paint controversy so far as Lewis is concerned, for he proposed to furnish this two coat application on the walls and ceilings of all units at no change in contract time or price, contingent upon Owners omitting a fresh coat of rubber base paint from the kitchens and baths.

In a letter dated April 30, 1953 and signed by Lippincott, Contractors' Superintendent, this information was passed on to Owner with a request for a change order and a time extension. On the same date in another letter signed by J. T. Hubbell, one of the Associated Contractors, Contractors asked Owner to reinstate the Contractors' proposal of June 9, 1952, requesting an additional price of $92,000 for the application of two coats of paint.

It is important to note here that neither Contractors' Superintendent nor J. T. Hubbell in their letters of April 30, 1953, accepted or agreed to carry out the proposals made (to Contractors, not Owner) by Lewis in his letter of April 24, 1953. Lewis proposed to apply two coats of paint at no change in contract time. The Superintendent, concerned primarily with the time element, requested a time extension. But J. T. Hubbell, one of the Contractors, concerned primarily with the price consideration, asked for an additional $92,000 on the contract price if the two coat plan should be adopted.

Meantime C. Russell Lewis proceeded to apply two coats of paint to the walls and ceilings of the various units. He later presented a bill for $79,000 to Contractors for applying the second coat of paint. This bill was not paid. Lewis soon thereafter "went broke".

Lewis joined in the suit against Owner, asking judgment for the sum of $79,200 based on "economic coercion" alleged to have been brought to bear on him by Owner which coercion caused him to agree to apply two coats of paint at no additional cost. He further alleged that after he had started performance of his paint subcontract, Owner through its architects, engineers, et al. unreasonably, capriciously, wantonly, maliciously and arbitrarily refused to accept his painting and texture work.

The jury answered Special Issues Nos. 112 to 120 as follows: (112) the application of a second coat of paint on buildings under contract C constituted extra work; (113) Owner, through its architects, required Lewis to do such extra work; (114) the reasonable cost to Lewis of applying said second coat of paint was $32,963.53; (115) Owner in refusing to accept one coat of paint was arbitrary and capricious; and (116) (117) (118) (119) similar answers were made with reference to buildings under Contract D, the cost to Lewis being found to be $18,516.88. The jury also found that Lewis was under duress by Owner when he signed the letter agreeing to apply two coats of paint instead of one free of charge.

The court entered judgment for Contractors, including C. Russell Lewis, for $51,480.41 principal and $8,683.00 interest— a total of $60,113.41.

In its 12th point Owner says that the trial court erred in overruling its motion for instructed verdict as to the claim of C. Russell Lewis.

In connection with its 12th point Owner contends that C. Russell Lewis was not a proper party plaintiff since Lewis was a subcontractor and there was no privity of contract between him and Owner. The specifications expressly provided that

nothing in the contracts between Owner and Contractors should create any contractual relations between any subcontractor and the Owner. On this ground Owner filed a plea of misjoinder, objected to the admission of testimony in behalf of Lewis, and moved for an instructed verdict as to Lewis. The plea, the objections, and the motion were overruled.

Duress is a tort. It often arises in connection with breach of contract, but it is nevertheless a tort, and it is not necessary that there should have been privity of contract between the parties as a prerequisite for such a tort action. One who sustains damage as a result of being subjected to duress may sue as plaintiff against the wrongdoer. "Economic coercion", the basis of Lewis' cause of action, is generally considered a form of duress.

In 52 Am.Jur. 380 it is said "It is worthy of notice that a tort may involve acts which also constitute a breach of contract, and that the same facts will sustain either an action ex delicto or ex contractu, so that an action ex delicto will lie, notwithstanding the act complained of would also be ground for an action ex contractu. Under this rule, it has been held that accompanying every contract there is a common law duty to perform with care, skill, reasonable expedience, and faithfulness the thing agreed to be done, and the negligent failure to observe any of these conditions is a tort, as well as a breach of contract. Under such circumstances, the general rule is that the plaintiff may elect which to pursue."

Since the claim of Lewis was grounded on duress, he had a right to sue in a tort action as plaintiff in his own behalf.

■ Owner also asserts that its motion for instructed verdict should have been sustained because there was no testimony to support the jury's finding in answer to Issue No. 115 that Owner, through its architects, was arbitrary and capricious in refusing to accept the one coat system paint work of C. Russell Lewis.

Considerations of space forbid our quoting or narrating the testimony in any great detail. From the time the architects first refused to accept the paint work Lewis, in an effort to please the architects and inspectors, and dealing directly with them, submitted samples, suggested changes and spent much time on different occasions conferring with Owner's architects and inspectors. He was a paint contractor of 20 years experience and had done other paint jobs similar in size and character to this one. But the negotiations dragged on and, according to Lewis and other witnesses, nothing he proposed within the plans and specifications could gain the approval of the architects.

At the risk of being tedious we must quote at some length from the testimony of Lewis:

"The architects, Tracy and Mr. Lane, Mr. Lane was in on several of these conversations, and he had come over to the buildings to look at the sample, and each time we would think that we had it just where we wanted it, they would look at it and want some minor change, wanted a little more texture or not so much texture, or something or other. And that went on for that length of time. So finally, I called Mr. Lane—I saw we weren't getting anywhere—and asked him—told him that we had to do something about this material, that we had to go. So he came out and visited some of these rooms, and I believe Mr. Swank was with him, and at that time we thought we had it just where we wanted it. Well, Mr. Swank walked up to the wall and said, 'Well, I don't know how we can determine—how we can arrive at a standard texture unless we draw a circle and count those granules in there and let that be a sample.' Well, that was assinine and silly, in our estimation. My superintendent just threw up his hand and said, 'Well, I am going to quit, Russell; I have been with you a long time. We can't satisfy them'.

"They brought up a wash test which we had never heard of. Q. Was that a contraction or a gadget that they finally brought out there that scrubbed this thing, with pumice in it, is that what you are talking about? A. * * * it is a machine that is set up—you place a little block of painted surface on the base of this machine, and then there is a little arm that works a lever back and forth which has a one-pound weight on it, with a sponge on it saturated with water and Lava Soap, and the number of strokes that it will do before it breaks through this film determines the resistance of the paint, that the paint has to scrubability. So that was the test they wanted to see, which we had never heard of up until this time. So we said, 'Well, we will take it out to Jones-Blair's Laboratory; they have a machine like you want.' So Mr. Cliff Lane, Tracy, and Walter Smith, my superintendent and myself, went out to the Jones-Blair laboratory to see this test run. * * * we watched them test, and every few hundred strokes, we would stop the machine and look at it through the microscope to see when it began to break down, what would happen when the paint surfaces began to wear off the tops of these granules, let the water in, and it would break rapidly. But Sherwin-Williams, I think runs about 1400 strokes; I believe that is the record, about right, which they were happy with. Well, ours at that time went to 2700 strokes on it * * * they were very elated with that test, which seemed to be the last test it would have to meet. * * * So we were all very happy —we were happy that we had found a material that we could go ahead with the job, so on the way back to the office, Mr. Lane, I believe, was driving, and Mr. Tracy and Mr. Smith were in the front seat; my superintendent and I were in the back seat. So, he said 'Well, if you are happy now, can we go to work tomorrow?' They said, 'Well, we don't know yet.' We said, 'Well, what will it take; what do you want now?' They said, 'Well, you are going to have to give us a letter that it won't cost the Housing Authority any more money to put on two coats.' I said, 'Well, it is going to cost us more money, we know that, but if that is the only way out, maybe, that is what we will have to do. We have got to go on with the job.'

"Now, there was nothing in the specifications about any wash test, but when we were trying to get our material passed, after it passed the primary wash test by hand, then they said, 'Well, what will it do if you have water on it for a while?' I said, 'Well, what do you mean?' They said, 'Well, let's put the water on it, let's let it soak for a while.' So we left the water on it for about two hours and came back and it looked all right. So then they asked us to leave it on there all night, so we put it on the board and left it there all night, and it was about two days old, so the next morning it could be scratched or rubbed off. It takes this material about 21 days to reach its maximum hardness.

"* * * That was painted over sheet rock. But after we had gone on with our spraying and everything was satisfactory, there came a time when they inspected some of these buildings—some of them were complete at first, these 35 buildings— we expected to get a final inspection on them and when it came to that, we finally had to go back and paint nearly all of the 35 buildings that they had indicated that they would accept. We had to paint that all with brush, because we couldn't take our spray equipment back in there at that time; the floors were finished, and were done, and it wouldn't pay us to take the spray equipment, so we had to brush it, which was very costly. * * * Many times the inspector would say, 'Do this apartment over' and we would go around and see what there was to do and maybe there would be one wall that should be done over; sometimes we could get by with one wall and sometimes they would say, 'Do the apartment over'.

"Well, you had inspectors out there by the hordes, didn't you? Yes, that was one

of the big troubles; we had lots of inspectors out there. I don't know how many were on the project; there must have been fifteen or twenty in that office every morning; they have told me that what would happen—they would go into their meeting— * * * All right, I will name this inspector; it was Mr. Doughty. * * * He said that they would have these meeting and they would compare their lists of these little minor adjustments that they found the day before, and if they didn't have them on their lists, they would put them on their list and they would go around and look for those same things. So what it amounted to, we were trying to please about fifteen or twenty inspectors and I don't know how many architects, because many times we would have decision on the texture on this wall, and we would think had them pleased, and another architect of this associated group of architects would come by and voice his opinion, and then it would be changed.

"At the time there was no other point. I went to them several times and said, 'What can we use; you tell me what to put on and I will put it on.' I have gone to Mr. Lippincott and told him the same thing, so nobody could tell me and I began to work on a formula for myself, to get one approved, and that is what we did, and after we had worked it out, I had to write the letter to get to use it, knowing it was going to cost me a lot of money, but I weighed it against both ways, I had either to go broke, have the bonding company take over — * * *.

"All right, Mr. Lane, and those inspectors, when they agreed on this paint, and they looked up this two coat system, they said: 'now, you may proceed with this on your own risk, but you cannot proceed with the one-coat system. Now, you can proceed with this on your own risk, but if it doesn't meet our approval in these next few days, we get this letter, you may have to remove it all from the wall.' * * * No, sir, the only way that was discussed from anyone in the Housing Authority was

returning from the laboratory, and the question came up and they said we would have to give them a letter before we could go ahead with it, before we could get their approval on it."

We quote from the testimony of Lippincott, Contractors' Superintendent:

"The specifications as drawn called for one coat Brocado, one coat, Sherwin-Williams, contract specifications amended during the bidding. Shortly after that, almost immediately, within two or three days, he wrote us a letter 'don't take any action on paint because there is some trouble here on Brocado', and then they put out an addendum and said it we used Brocado we would have to use two coats but we could use one coat of Sherwin-Williams, so we quoted on two-coat work. * * * The reply stated that since we had asked for in these discussions Suncolide and Jones-Blair now have been tentatively approved for two coat work, therefore, since we had the option of using three people, Sherwin-Williams, Suncolide and Jones-Blair, they could see no reason for increase in price because of the change in the product. That was a false letter, sir, and Mr. Lane in his deposition has verified that letter was false. Those people were never approved and he stated so in his deposition.

"On October 31st we wrote them a letter asking whether Sherwin-Williams' paint, one coat of paint, would be satisfactory results and they replied on November 21st, that 'we by no means intended that Sherwin-Williams' product was the only one acceptable. There are actually several brands that appear to be satisfactory. We do not want to appear arbitrary'. That is a false letter, sir, and Mr. Lane's deposition shows that it was false, because there weren't any other brands, he says now, that were satisfactory. * * *

"We started painting, using Sherwin-Williams' material. On April 9, 1953, the architect writes us a letter that 'the Sherwin-Williams silicon texture paint now be-

ing used on this "C" project does not meet the specifications or the approval sample and you are hereby directed to discontinue its use immediately'. So as of April 9, 1953 Mr. Lane had not approved for use on this project any one-coat material of any kind. So, what does poor Russell Lewis do? He comes in on April 30th with an agreement to do two coat work at no change in time or price. Now, on that same date I told them we were going to ask for time extension and price; we wrote them two letters, doing that. I was trying to protect Russell Lewis against himself. On May 6th the architects write: 'The tests have indicated that all the paint materials used on this project were equal to the materials specified.' So, on April 9th there isn't any one coat of paint we can use. On April 30th he gets two coats of paint for nothing an extra coat of paint. On May 6th he comes back and says Sherwin-Williams' material was all right all the time. Now, that is the action of a small man * * * if there is one thing I would like to do is get some relief for Russell Lewis."

The architects testified in behalf of Owner and defended their actions in disapproving Lewis' one coat paint work. The evidence is conflicting, but we cannot agree with Owner when it asserts that there is no testimony that the architects acted arbitrarily and capriciously in refusing to accept Lewis' paint work.

Owner further says that its motion for instructed verdict should have been sustained because there is no testimony that Lewis was under duress when he signed the letter of April 24, 1953, agreeing to put on two coats of paint instead of one without charge.

Duress under the early common law did not include "economic coercion" or "business compulsion". But in modern times the meaning of duress has been expanded to include the term. 17–A Amer.Jur. 564; Goodrum v. State, Tex.Civ.App., 158 S.W. 2d 81.

In this connection the trial court gave this definition: "By 'Duress', as that term is used in this charge, is meant any unlawful or unconscionable coercion of another, either mental, physical or otherwise, causing him to act contrary to his own free will or to submit to a situation or condition against his own volition or interest."

The jury verdict, it must be recalled, was to the effect that Owner required Lewis to apply a second coat of paint, that Owner was arbitrary and capricious in refusing to accept the one coat work of Lewis, and that Lewis was under duress when he signed the letter of April 24, 1953, agreeing to apply the second coat of paint free of charge.

The testimony on the issue of "economic coercion", or "business compulsion" is lengthy. We have quoted and referred to only a small portion of it. We shall not quote more. Suffice it to say that after a consideration of the testimony we are unable to agree with Owner's contention that there is no testimony to support the jury's verdict that Lewis was under duress when he signed the letter of April 24, 1953. We overrule Owner's 12th point on appeal.

In its 30th and 31st points on appeal Owner challenges the submission of Issues Nos. 112 and 116, which the jury answered to the effect that the application of the second coat of paint to the buildings constructed under Contract C and Contract D, respectively, constituted extra work.

In our consideration of the judgment for extras we have already sustained Owner's 17th to 29th points of error which attacked similar issues on the ground that they submitted issues of law. Issues Nos. 112 and 116 may be objectionable for the same reason. Consequently we would sustain Owner's 30th and 31st points on appeal were it not that we are of the opinion that the submission of Issues Nos. 112 and 116 must be regarded as harmless error.

The judgment in favor of C. Russell Lewis is not grounded on contract. It is

grounded on the tort of "economic coercion"—a form of duress. Therefore the submission of Issues Nos. 112 and 116 and the jury's answers thereto should be regarded as surplusage. They are not material to the recovery of damages awarded to Lewis. The answers to Issues Nos. 114 and 115 and Nos. 118 to 120, inclusive, establish a sufficient factual basis to support the judgment pertaining to the second coat of paint applied by Lewis. It is to be remembered that in answering these issues the jury found that the second coat of paint was applied at a reasonable cost to Lewis of $32,963.53 and $18,516, that Owner acted arbitrarily and capriciously in refusing to accept the one coat system of paint work of Lewis, and that Lewis was under duress by Owner at the time he signed the letter agreeing to put on two coats of paint instead of one without charge. Owner's 30th and 31st points are overruled, for the reason that their submission was harmless error. Vrazel v. Bieri, Tex.Civ.App., 294 S.W.2d 148 (Syl. 6); Ricks . v. Thielepape, . Tex.Civ.App., 222 S.W.2d 399; 41–B Tex.Jur. 506–507; Rule 434, Texas Rules of Civil Procedure.

The only points in which Owner has attacked the Lewis judgment are the 12th point, in which Owner alleges error of the trial court in overruling its motion for instructed verdict as to C. Russell Lewis; and its 30th and 31st points, which we believe point out only harmless error as above stated. We have overruled these points. Therefore we have concluded that the judgment in favor of Lewis and the other contractors pertaining to the paint job should be affirmed.

### Attorneys' Fees of $60,000.

In answer to Special Issue No. 129 the jury found that $60,000 would be a reasonable attorneys' fee to allow Contractors for the prosecution of their suit. Based on this jury finding and on Art. 2226, V.A.C.S., the trial court awarded Contractors a judgment of $60,000 as attorneys' fee.

Owner has attacked this part of the judgment in its 16th and its "additional" point. In the latter point it asserts that it is not a private corporation, but is a public body corporate and politic created by the Texas Housing Law, Art. 1269k, V.A.C.S., hence cannot be held liable for attorneys' fees under Art. 2226, V.A.C.S.

We agree with Owner. It has been held that Art. 2226, V.A.C.S., applies only to private corporations. City of Houston v. L. J. Fuller, Inc., Tex.Civ.App., 311 S.W. 2d 285. We must take notice that Owner, Housing Authority of the City of Dallas, is a public body corporate and politic under Art. 1269k, V.A.C.S.

This particular ground is raised for the first time by Owner as an "additional" point in its Supplemental Brief. But as the court's judgment expressly finds that Owner is liable for $60,000 attorneys' fee and it is obvious from the judgment itself that the allowance for attorneys' fee is included in the judgment awarded to Contractors, we must take notice of the error. Owner's 16th point and its "additional" points are sustained.

### Miscellaneous.

In its 13th point Owner alleges error by the trial court in overruling Owner's motion to disregard the findings of the jury on Special Issues Nos. 122 and 125, and to render judgment for Owner non obstante veredicto as to such findings.

The jury's answers to Issues No. 121 to 126, inclusive, were in substance that E. H. Reeder, the prime utilities contractor, caused damage to the buildings constructed by Contractors under Contract C in the amount of $1,334.43, and to the buildings under Contract D in the amount of $584.-99; and that Owner failed to withhold said sums of money from its final payment to Reeder. Judgment was rendered against Owner for these amounts.

The written contract between Contractors and Owner expressly provides that in the event the work of Contractors is damaged by other contractors, the damaged work will be repaired by Contractors, who will seek redress only from those who caused it. The contract also expressly provides that if it so elects Owner may withhold, but it is not required to withhold, from any payment due a contractor so much as may be necessary to protect Owner from claims of other contractors.

■ Contractors claim this part of the judgment was proper because Owner failed to coordinate the work of Reeder with other contractors, as it was bound to do under the terms of the written contract, hence should have withheld from Reeder a sum equal to the damages suffered by Contractors because of Reeder's wrongdoing.

We see no merit in this claim. Owner's contractual obligation to coordinate the work of the various contractors does not mean that Owner is responsible for damages suffered by one Contractor resulting from torts committed by another Contractor. We see no basis for imputing to Owner the negligence of Reeder, if he was negligent, in damaging concrete steps, slabs and brick work while Reeder was performing his utilities contract. Owner's 13th point is sustained.

■ In its 61st and 62nd points Owner complains of the admission of testimony as to delays caused by changes in the windows and roof trusses, the nonavailability of the site, and by the cement break-down, for the reason that time extensions were agreed to by the parties as to these matters. Contractors do not deny such time extensions were agreed to, but say that the testimony was admissible because it had some bearing on controverted matters. At any rate we shall not presume that the error in admitting the testimony, if it was error, was harmful to Owner. Rule 434, T.R.C.P. Points 61 and 62 are overruled.

■ In its 64th point Owner objects to the submission of Special Issues Nos. 27 and 28 which inquired whether Contractors completed Contract C and Contract D, respectively, within a reasonable time, taking into consideration the delays that occurred. One of Owner's grounds of objection was that the issue as submitted is multifarious. We think the objection is well taken. The 64th point is sustained.

Owner's 70th point complains of the submission of issues pertaining to alleged interference by the Owner, other than in the Poteet matter. The judgment of the trial court did not include any damages for interference except in the Poteet matter. However we agree that the issue in the form in which it is submitted is multifarious. The 71st and 72nd points are dependent on the answer to the 70th point. The 70th, 71st and 72nd points are sustained.

■ On August 31, 1953, Owner through one of its inspectors informed Contractors that all exterior doors were being condemned because they did not measure up to the specifications, and that the sum of $64,840 would be withheld from payment to Contractors. There is testimony that some of the doors were warping, peeling, splitting, disintegrating, admitting moisture and swelling. As it turned out Owner did not withhold the money. However Contractors executed a $15,000 bond guaranteeing some of the exterior doors for a period of five years.

In answering Special Issues No. 127 and 128 in regard to Contract C and Contract D, respectively, the jury found that Contractors were under duress when they agreed to furnish the bond. These were the only issues submitted to the jury in regard to the doors in question. Based on the jury's answers the trial court entered judgment cancelling the bond.

In its 73rd point Owner asserts that the court erred in entering this part of the judgment.

We agree with Owner. The evidence is not sufficient to support a finding of duress in this instance. There is no indication that Contractors were coerced into acting contrary to their own free will or to submit to a condition against their own volition. On the contrary Lippincott, Contractors' Superintendent, frankly stated that Contractors entered into the agreement "with our eyes wide open." By agreeing to execute the bond Contractors obtained the consent of Owner to accept the doors in question without further inspection. This was after some of the doors had been taken down, torn apart, and their defects exposed. The testimony which Contractors rely on to support the jury's finding of duress does not remotely compare with the testimony which furnished the basis for the finding of duress in the case of C. Russell Lewis, the paint subcontractor. Owner's 73rd point is sustained.

In its 33rd and 34th points Owner objects to the submission of Issue No. 61 on the ground that as submitted the issue contained a comment on the weight of the evidence and was multifarious and duplicitous. The 33rd and 34th points are sustained.

Owner's 65th point complains of alleged remarks made by the trial judge. We cannot say that the comments of the court probably caused harm. Owner's 65th point is overruled.

■ Owner admits that the recovery of $12,717.31 for extra concrete and $1,240.22 for grading beyond the five-point perimeter of the buildings were proper awards, and says that the judgment as to such recoveries should be affirmed. However both these items are elements in Contractors' suit for damages for alleged breach of contract and for extras. The issues in that cause of action are indivisible, not severable. Waples-Platter Co. v. Commercial Standard Ins. Co., Tex., 294 S.W.2d 375; Fisher v. Coastal Transport Co., 149 Tex. 224, 230 S.W.2d 522. We are not authorized to require the cause of action to be tried piecemeal. Since we are reversing and remanding the judgment for damages awarded to Contractors for breach of contract and extras, we must reverse the whole judgment in that cause of action, including the recoveries for extra concrete and grading.

■ The nature of this case, the great number of issues of fact involved, the innumerable and complicated instances of alleged interferences, delays, and extras, each of which must be considered item by item, make the trial of this case very difficult, especially in connection with the submission of special issues to a jury. In our opinion this is an exceptional case in which good cause exists for the appointment of a master in chancery under Rule 171, T.R.C.P. Either side would, of course, be entitled to a jury trial after the master had filed his report. But the jury trial could be limited to those items in the report to which either or both parties have excepted in writing. 34 Tex.L.Rev. 326; 9 S.W.L. Journal 239; Vol. V, No. 4, Baylor Law Rev. 374. We recommend, but we do not direct, that a master in chancery be appointed in this case.

We reverse the trial court's judgment and remand the cause for new trial with reference to the following recoveries:

(1) Liquidated damages alleged to be wrongfully withheld by Owner ................................$143,063.36
(2) Delays alleged to have been caused by Owner............. 253,410.18
(3) Interference with Poteet .................................. 226,864.48
(4) Extras ................................................... 163,449.79
(5) Attorneys' fees .......................................... 60,000.00

Total........................$846,787.81.

We reverse also that part of the judgment cancelling the bond given by Contractors in connection with the outside doors.

Since the recovery of $60,113.41 in favor of Contractors and C. Russell Lewis jointly in connection with the paint job is based upon a separate, severable cause of action, namely, an action in tort for duress, and Owner has not shown reversible error as to the judgment, we affirm the said judgment in favor of Contractors, and C. Russell Lewis jointly for $60,113.41.

None of the costs will be taxed against C. Russell Lewis. Costs will be taxed against Associated Contractors.

Reversed and remanded in part and affirmed in part.