**MEMC ELECTRONIC MATERIALS, INC., and MEMC Pasadena, Inc., Appellants,**

v.

**ALBEMARLE CORPORATION, Lexington Insurance Co., and Travelers Property Casualty Group, Appellees.**

No. 01–05–00420–CV.

Court of Appeals of Texas, Houston (1st Dist.).

Feb. 15, 2007.

Alan Brandt Daughtry, Richard E. Griffin, Jackson & Walker L.L.P., Houston, TX, for Appellants.

Jefferson Hunt Read, Villalobos & Vaughan, P.L.L.C., Houston, Theresa De-Ford, Richard Virnig, Rathwell & Nikiakek, P.C., Spring, Lyle R. Rathwell, Rathwell & Nizialek, L.L.P., The Woodlands, TX, for Appellees.

Panel consists of Justices TAFT, ALCALA, and HANKS.

## OPINION

ELSA ALCALA, Justice.

Appellants, MEMC Electronic Materials and MEMC Pasadena (collectively MEMC), appeal the trial court's order that granted a motion for partial summary judgment urged by appellees, Albemarle Corporation and its insurers, Lexington Insurance and Travelers Property Casualty Group, and that denied MEMC's cross-motion for partial summary judgment.[1] After Albemarle indemnified Ethyl Corporation for claims paid by Ethyl to three people who were injured in a fire at a manufacturing plant, Albemarle sought indemnification from MEMC for Albemarle's payment to Ethyl. MEMC refused to indemnify Albemarle, contending that the Asset Purchase Agreement between MEMC and Albemarle does not require the indemnification. In a single issue on appeal that challenges the trial court's rendition of summary judgment in favor of

---

1. The trial court granted the parties' Joint Motion to Sever and Abate the damages portion of the case, rendering the grant of partial summary judgment a final, appealable judgment.

Albemarle, MEMC asserts three reasons that the trial court should have rendered judgment in its favor. First, MEMC contends that Albemarle's right to obtain indemnification from MEMC under the Asset Purchase Agreement was not triggered by the claims against Ethyl because every claim for which Ethyl was held liable arose out of Ethyl's design and operation of the plant prior to the closing date of the Asset Purchase Agreement. Second, MEMC asserts that the Ethyl Indemnity Agreement was not an obligation that it assumed under the terms of the Asset Purchase Agreement. Third, MEMC states that Albemarle's claim for indemnity is unenforceable under Texas and Virginia law. Albemarle replies by asserting that its indemnification of Ethyl was required under Virginia law, that the indemnification provision of the Asset Purchase Agreement is not modified by any other part of the agreement, and that the indemnification's before-and-after nature provides for the indemnification that it seeks here.[2]

Considering the entire agreement and all individual provisions in the context of the whole instrument, we conclude that the Asset Purchase Agreement does not obligate MEMC to indemnify Albemarle for its payment to Ethyl for Ethyl's liability for injuries caused by a fire at the plant. We do not reach the issue of whether the laws of Texas and Virginia make the indemnity agreement unenforceable as matter of law. We reverse and render judgment in favor of MEMC.

## Background

Ethyl designed and built a polysilicon manufacturing plant located in Pasadena, Texas. In 1994, Ethyl created Albemarle as a separate company and transferred various of its businesses, including the plant, to Albemarle's ownership and control. The transfer was under a "Reorganization and Distribution Agreement." Ethyl and Albemarle also entered into an "Indemnification Agreement," under which Albemarle agreed to "indemnify, defend and hold harmless Ethyl ... from and against any and all Indemnifiable Losses of the Ethyl Indemnitees arising out of or due to the failure or alleged failure of Albemarle or any of its Affiliates to pay, perform, or otherwise discharge in due course any of the Albemarle Liabilities." The agreements between Ethyl and Albemarle are governed by the laws of the state of Virginia.

In 1995, Albemarle sold the plant to MEMC pursuant to an "Asset Purchase Agreement" that is governed by Texas law. The closing date for the agreement was July 31, 1995. Under a separate agreement, MEMC and Albemarle agreed that Albemarle would continue to operate the plant.

The Asset Purchase Agreement describes the transfer of the plant and other assets and liabilities in Sections 3.3 and 3.4. Some assets and liabilities were specifically excluded from the transfer, and only certain liabilities were assumed by MEMC. Section 3.4(b) specifies that MEMC "shall not assume any other Liabilities of Seller whatsoever" except "those Liabilities specifically assumed" in Section 3.4(a). Section 3.4(a) does not mention the agreement between Ethyl and Albemarle, nor was that agreement a contract that was assumed by MEMC in the accompanying Schedule 3.4(a)(i). The agreement further specified that MEMC did not assume

**2.** Both parties filed post-submission supplemental briefs with this Court. We allow this supplementation in accordance with Rule 38.7 of the Texas Rules of Appellate Procedure. *See* Tex.R.App. P. 38.7 ("A brief may be amended or supplemented whenever justice requires, on whatever reasonable terms the court may prescribe.")

any liability that results or arises from the operation of the plant prior to the closing date.

Albemarle made certain representations and warranties to MEMC. Under Section 4.16, labeled "Contracts and Commitments," Albemarle represented that, except as set forth in Schedule 4.16, it was "not a party to" and the transferred assets "are not bound by" and the Assumed Obligations "shall not include, any written or oral, formal or informal ... agreements between or among Seller and any Affiliate of Seller ...." Schedule 4.16 did not mention the indemnity agreement between Ethyl and Albemarle.

The Asset Purchase Agreement between Albemarle and MEMC included an indemnity provision. Generally speaking, depending on whether the damages arose out of the operation of the plant "prior to the closing date" or "on or after the closing date," MEMC would indemnify Albemarle for the damages, or Albemarle would indemnify MEMC for the damages. In Section 7.3, Albemarle agreed to indemnify MEMC from and against all damages incurred by MEMC directly or indirectly by reason of or resulting from liabilities, obligations or claims, with respect to the plant arising out of operations of the plant *prior to* the Closing Date. Similarly, Section 7.4 provided that MEMC would indemnify Albemarle from and against all damages asserted against, resulting to, imposed upon or incurred by Albemarle, directly or indirectly by reason of or resulting from liabilities, obligations or claims with respect to the plant arising out of the operations of the plant *on or after* the Closing Date.

In 1996, three Albemarle employees were injured when a fire broke out at the plant. The employees, collectively referred to as the *Damewood* plaintiffs, filed a lawsuit against a number of parties, including Ethyl and MEMC.[3] Albemarle, which carried worker's compensation coverage, was not subject to suit. MEMC settled with the *Damewood* plaintiffs. Of the parties relevant to the present case, only Ethyl went to trial in the underlying litigation. Pursuant to the agreement between Ethyl and Albemarle, Albemarle defended Ethyl in the *Damewood* litigation. At the close of the trial, Ethyl was the only remaining defendant, and a jury rendered a verdict in excess of six-and-a-half million dollars against Ethyl. Ethyl appealed, and while the appeal was pending, it settled with the *Damewood* plaintiffs for approximately five million dollars. Ethyl sought indemnification from Albemarle under the terms of their agreement. Albemarle indemnified Ethyl for its losses, which is the amount that Albemarle now seeks from MEMC in this lawsuit.

MEMC filed for summary judgment, which was denied. Albemarle then filed a motion for partial summary judgment on the issue of whether MEMC was obligated to indemnify Albemarle, and MEMC reurged its motion as a cross-motion for partial summary judgment. The trial court ruled in Albemarle's favor. The trial court severed the summary judgment order and abated the question of damages so the parties could bring the present appeal.

## Standard of Review

When reviewing cross-motions for summary judgment, we consider both motions and render the judgment that the trial court should have entered. *Coastal Liquids Transp., L.P. v. Harris County Appraisal Dist.*, 46 S.W.3d 880, 884 (Tex. 2001). Further, in a contract action where, as here, neither party contends

---

**3.** *Larry Damewood, Gary Woodard, and Roy Moss v. Ethyl Corporation*, Cause No. 96– 38521, in the 189th District Court of Harris County, Texas.

that a contract is ambiguous, a court should construe the contract as a matter of law, and, on appeal, the court's ruling is subject to de novo review. *See J.M. Davidson, Inc. v. Webster,* 128 S.W.3d 223, 229 (Tex.2003) (citing *Coker v. Coker,* 650 S.W.2d 391, 394 (Tex.1983)) (applying rule to arbitration agreement); *C.M. Asfahl Agency v. Tensor, Inc.,* 135 S.W.3d 768, 780 (Tex.App.-Houston [1st Dist.] 2004, no pet.) (interpreting asset purchase agreement); *Tesoro Petroleum Corp. v. Nabors Drilling USA, Inc.,* 106 S.W.3d 118, 125 (Tex.App.-Houston [1st Dist.] 2002, pet. denied) (interpreting indemnity agreement); *Webb v. Lawson–Avila Constr., Inc.,* 911 S.W.2d 457, 459–60 (Tex.App.-San Antonio 1995, writ dism'd w.o.j.).

■ "An indemnity agreement is a promise to safeguard or hold the indemnitee harmless against either existing and/or future loss liability." *Dresser Indus., Inc. v. Page Petroleum, Inc.,* 853 S.W.2d 505, 508 (Tex.1993). Indemnity provisions are to be strictly construed, pursuant to the usual principles of contract interpretation, in order to give effect to the parties' intent as expressed in the agreement. *See Ideal Lease Serv., Inc. v. Amoco Prod. Co.,* 662 S.W.2d 951, 953 (Tex.1984). In construing a written contract, the court's primary concern is to ascertain the true intent of the parties as expressed in the instrument. *J.M. Davidson, Inc.,* 128 S.W.3d at 229; *see C.M. Asfahl Agency,* 135 S.W.3d at 780. Accordingly, the court must examine and consider the entire writing in an effort to harmonize and give effect to all provisions so that none is rendered meaningless. *J.M. Davidson, Inc.,* 128 S.W.3d at 229. The court may not consider any single provision, taken in isolation, as controlling, but must consider all provisions in the context of the entire instrument. *Id.*

## Obligations Assumed by MEMC Under the Agreement

■ MEMC contends that, in its Asset Purchase Agreement with Albemarle, it did not assume an obligation for the indemnity agreement between Ethyl and Albemarle. MEMC contends that Sections 3.4, 4.16 and 3.3(b) exclude the agreement between Albemarle and Ethyl from the agreement between Albemarle and MEMC. Albemarle does not dispute that the agreement between Ethyl and Albemarle is never mentioned specifically in the agreement between Albemarle and MEMC. Albemarle, however, asserts that it is entitled to indemnification from MEMC under Section 7.4, the section of the agreement that pertains to indemnification.

### A. MEMC Does Not Assume Obligation for Ethyl–Albemarle Agreement

MEMC points to Section 3.4 of the Asset Purchase Agreement to show that it did not assume any obligation for the indemnity agreement between Ethyl and Albemarle. As noted above, Albemarle does not dispute that Section 3.4 does not mention the agreement between Ethyl and Albemarle.

### 1. Section 3.4(a)

The Asset Purchase Agreement describes the transferred business and transferred assets. Section 3.4(a) specifically describes "Assumed Obligations." These are obligations, assumed by MEMC, of liabilities that belong to Albemarle. The only obligations that are assumed by MEMC are those that are listed in Schedule 3.4(a)(i), the "Assumed Contracts[.]"[4]

---

**4.** The Asset Purchase Agreement states,
Section 3.4 *Assumptions by MEMC Pasadena*

(a) *Liabilities Being Assumed.* Except as otherwise expressly provided herein and subject to the terms and conditions of the

The agreement between Ethyl and Albemarle was not listed in Schedule 3.4(a)(i) as a contract that was assumed by MEMC. Moreover, the agreement between Albemarle and MEMC specifically provided that MEMC would "assume no liabilities relating to the Assumed Contracts which result or arise from operation of the Transferred Business or the Transferred Assets prior to the Closing Date." MEMC thus correctly points out that Section 3.4(a) provides that MEMC is assuming an obligation for only the liabilities of Albemarle that "are listed in *Schedule 3.4(a)(i)* [,]" and that the agreement between Ethyl and Albermarle is not listed in that Schedule. We agree with MEMC's representation that under Section 3.4(a), it has not assumed liability for the agreement between Ethyl and Albemarle.

### 2. Section 3.4(b)

The Asset Purchase Agreement specifies under Section 3.4(b) that liabilities of Albermarle are not being assumed by MEMC. The only exception is that MEMC is assuming liability for items listed in Schedule 3.4(a)(i), which is the schedule included within 3.4(a). Section 3.4(b) states that MEMC "shall not assume any other Liabilities" of Albemarle, unless the liability is "specifically assumed in writing" under Section 3.4(a). The agreement between Albemarle and Ethyl is not listed in Schedule 3.4(a)(i) and is therefore excluded from the obligations assumed by MEMC. MEMC thus accurately represents that under Section 3.4(b), it has not assumed liability for the agreement between Ethyl and Albemarle.[5]

In summary, Sections 3.4(a) and (b) provide that MEMC is not assuming obligation for liabilities of Albemarle that are not specifically set forth in Schedule 3.4(a). The agreement between Ethyl and Albemarle is not mentioned in Schedule 3.4(a). We conclude that Section 3.4 of the agreement does not provide for MEMC to as-

Agreement, simultaneously with the sale, transfer, conveyance and assignment to MEMC Pasadena of the Transferred Assets, MEMC Pasadena shall assume and agree and undertake in writing to pay, perform, and discharge as and when due ... the following Liabilities of Seller (collectively, *"Assumed Obligations"*):

(i) those Liabilities of Seller under all contracts, leases, subleases, commitments, supply contracts, agreements and orders relating primarily to the operation of the Transferred Business or the Transferred Assets, but in all such cases only to the extent the same are listed in *Schedule 3.4(a)(i)* attached hereto (the *"Assumed Contracts"*) *provided, however,* that MEMC Pasadena shall assume no liabilities relating to the Assumed Contracts which result or arise from operation of the Transferred Business or the Transferred Assets prior to the Closing Date ....

5. Section 3.4(b) of the Asset Purchase Agreement states,

(b) *Liabilities Not Being Assumed.* Except for those Liabilities specifically assumed in writing by MEMC Pasadena pursuant to *Section 3.4(a)* hereof, MEMC Pasadena shall not assume any other Liabilities of Seller whatsoever such as (by way of example and without limitation of the scope of the preceding portion of this sentence), the following (collectively, *"Excluded Obligations"*).

(i) any Liabilities of Seller (other than Assumed Obligations) of any nature whatsoever (regardless of whether the existence of such Liability (A) is or was at any time known or unknown to MEMC Pasadena, MEMC or Seller or (B) constitutes or does not constitute a breach of any representation or warranty of Seller to MEMC or MEMC Pasadena) to the extent arising or incurred or which arose or were incurred on or before the Closing, or which are based on (1) events occurring on or before the Closing, or (2) the operation of the Transferred Business on or before the Closing, notwithstanding that the date on which the claim, demand or Liability arose is after the Closing ...

sume obligation for the indemnity agreement between Ethyl and Albermarle. Our task, however, is not merely to examine a single provision of the agreement, but to look at all the provisions in the context of the entire instrument in an effort to harmonize and give effect to all provisions so that none is rendered meaningless. *See J.M. Davidson, Inc.*, 128 S.W.3d at 229.

## B. Albemarle Did Not Disclose Ethyl–Albermarle Agreement

MEMC contends that the failure of Albemarle to disclose the existence of the indemnity agreement between Ethyl and Albemarle shows that there was never any obligation by MEMC for that agreement. Albemarle makes representations and warranties to MEMC in the Asset Purchase Agreement. Under Section 4.16(a)(x) of the Asset Purchase Agreement, Albemarle represents that it is not "a party to" and is "not bound by" any "agreements between or among" Albemarle and any "Affiliate." The indemnification agreement between Ethyl and Albemarle showed that Albemarle was Ethyl's "wholly-owned subsidiary[,]" which meets the definition of affiliate in the agreement between Albemarle and MEMC.[6] Further, Section 4.16(xiii) includes Albemarle's representation that it is not "a party to" and is "not bound by . . .

any other agreement, contract, commitment, arrangement or instrument that relate[s] to or may affect the plant."[7] The only exception to these provisions concerns agreements listed in schedules accompanying the Asset Purchase Agreement. As noted above, the indemnity agreement between Ethyl and Albemarle was never disclosed in any schedule, nor was it ever mentioned in the Asset Purchase Agreement. We conclude that Section 4.16 called for Albemarle to disclose contract and commitments that "relate to or may affect" the plant, but Albemarle did not disclose its indemnity agreement with Ethyl. We also conclude that Albemarle failed to disclose in Section 4.16 the indemnity agreement it had with its affiliate, Ethyl. Albemarle's failure to disclose its indemnity agreement with Ethyl suggests that MEMC was not aware of that agreement and did not obligate itself to cover any liability imposed under that agreement. We conclude that terms of Section 4.16 support MEMC's position that it is not obligated for the indemnity agreement between Albemarle and Ethyl.

In view of Sections 3.4 and 4.16 of the Asset Purchase Agreement, we conclude that those sections suggest that MEMC

---

**6.** "Affiliate" is defined in the agreement as "in the case of an entity, any person who or which, directly or indirectly, through one or more intermediaries, controls or is controlled by, or is under common control with, any specified Person (the term 'control' for these purposes means the ability, whether by ownership of shares or other equity interest, by contract or otherwise, to elect a majority of the directors of a corporation . . . or have the power to remove and then select, a majority of those Persons exercising governing authority over an entity)."

**7.** The Asset Purchase Agreement states,
Section 4.16 *Contracts and Commitments*
(a) Except as set forth in *Schedule 4.16* or in other Schedules to this Agreement hereof, to Seller's knowledge, Seller is not, with respect to the Transferred Business or the Transferred Assets, a party to, and the Transferred Assets and the Transferred Business are not bound by, and the Assumed Obligations shall not include, any written or oral, formal or informal . . .
[the section lists a number of possible contractual obligations]
(x) agreements between or among Seller and any Affiliate of Seller;
. . .
(xiii) any other agreement, contract, commitment, arrangement or instrument that relate to or may affect the Transferred Business, except for the Assumed Contracts.

was not obligated to indemnify Albemarle for the payment that it made to Ethyl.[8]

## The Indemnification Portion of the Agreement

Albemarle contends that the indemnification terms specified by Section 7.4 of the agreement require MEMC to indemnify Albemarle, and that under the rules of contract construction, we must favor an interpretation that affords some consequence to each part of the instrument so that none of its provisions will be rendered meaningless. Albemarle contends Section 7.4(a) requires MEMC to indemnify it for its obligation to Ethyl so long as that obligation [9] (1) is with respect to the transferred business,[10] and (2) arose out of the operation of the transferred business, (3) on or after the closing date.

MEMC's challenge on appeal focuses on the term "arising out of the operations of the Transferred Business ... on or after the Closing Date." MEMC contends that the undisputed evidence shows that Albemarle's payment to Ethyl was due to the agreement between them, which occurred prior to the Closing Date of the Asset Purchase Agreement between Albemarle and Ethyl, and that the payment did not arise out of the operations of the plant on or after the Closing Date. In short, the tort claims by the *Damewood* plaintiffs are not the legal basis for Albemarle's indemnity claim here. MEMC also asserts that the undisputed summary judgment record indicates that every claim for which Ethyl was held liable arose out of Ethyl's design and operation of the plant prior to the closing date of the Asset Purchase Agreement.

Albemarle responds that we should rely on the specific indemnity provision in Section 7.4(a) of the Asset Purchase Agreement, despite the fact that the Asset Purchase Agreement fails to mention the indemnity agreement between Ethyl and Albemarle. Albemarle contends that "Resolution of the meaning of the term 'arising out of' is, perhaps, the central and controlling issue presented to this Court." Albemarle asserts that it is asking this Court to give "arising out of" the "normal inclusive" reading that "reasonable mutual indemnitors would have accorded the phrase."

**8.** We disagree with MEMC that Section 3.3(b) supports its position that it is not obligated to Albemarle here, because we conclude that the section is inapplicable. Section 3.3(b) states that Albemarle continues to have responsibility for certain assets, including "(v) all indemnification rights against and indemnification agreements with other parties arising out of the Transferred Business or the Transferred Assets prior to the Closing Date." The indemnity agreement between Ethyl and Albemarle is not an asset of Albemarle's, but is rather a liability, and that Section, therefore, does not aid in our analysis of the issues here.

**9.** MEMC does not challenge Albemarle's assertion that it met the term "Liabilities, Obligations or Claims" because the lawsuit arising out of the January 1996 fire would qualify as an obligation, claim, or liability. The Asset Purchase Agreement defines Liabilities as: "any and all debts, claims, liabilities and obli-

gations of any kind, regardless of whether disclosure thereof would be required to be made in accordance with [Generally Accepted Accounting Principles], whether accrued or fixed, absolute or contingent or determined or determinable."

**10.** Albemarle contends that it is undisputed that the *Damewood* plaintiffs were injured while performing polysilicon manufacturing operations for the Pasadena business, and thus the injuries were "with respect to the Transferred Business." The agreement between Albemarle and MEMC defines "Transferred Business" as "all of the business of Seller related to the manufacture of granular polysilicon, silane, sodium aluminum fluoride, and sodium ethyl silicate at the manufacturing facilities of Seller located in Pasadena, Texas, but specifically excluding Seller's sodium aluminum hydride business[.]"

Under Section 7.4(a) of the Asset Purchase Agreement, MEMC must indemnify Albemarle for all damages asserted against, resulting to, imposed upon or incurred by Albemarle directly or indirectly by reason of or resulting from liabilities, obligations or claims with respect to the plant arising out of the operations of the plant on or after the Closing Date.[11] The *Damewood* plaintiffs were injured after the Closing Date of the Asset Purchase Agreement and there is no dispute that those injuries arose out of the operations of the plant. The damages at issue here, however, consist of the payment made by Albemarle to Ethyl pursuant to their indemnity agreement, which was an agreement in existence before the Closing Date of the Asset Purchase Agreement. We conclude that the payment made to indemnify Ethyl was not a liability, obligation or claim arising out of the operations of the plant, but rather a payment that arose out of the prior contractual relationship between Albemarle and Ethyl.

We disagree with the assertion by Albemarle that we will render Section 7.4(a) meaningless if we interpret the Asset Purchase Agreement to deny recovery here. The Asset Purchase Agreement plainly provides for MEMC to indemnify for damages arising out of the operations of the plant on or after the Closing Date. That indemnity agreement remains in place for any liabilities, obligations or claims that arise out of the operations of the plant on or after the closing date. Our holding merely denies recovery for any Albemarle liabilities, obligations or claims that arise out of unidentified, contractual obligations in existence prior to the Closing Date that were not specifically mentioned by the Asset Purchase Agreement with MEMC.[12]

Viewing the indemnity provision in context with the agreement as a whole, our conclusion is consistent with the other sections of the agreement. As we noted

---

11. Section 7.4 of the Asset Purchase Agreement provides that MEMC will indemnify Albemarle under certain circumstances. The agreement states,

> Section 7.4 *MEMC's and MEMC Pasadena's Agreement to Indemnify.* Subject to the terms and conditions of this *Article 7*, MEMC and MEMC Pasadena jointly and severally agree to indemnify, defend and hold harmless Seller from and against all Damages asserted against, resulting to, imposed upon or incurred by Seller, directly or indirectly (collectively, *"Seller Claims"*), by reason of or resulting from:
> (a) without prejudice to any obligations of Seller under the Operating Agreement or the Utilities and Services Agreement, liabilities, obligations or claims with respect to the Transferred Business or the Transferred Assets (whether absolute, accrued, contingent or otherwise) arising out of the operations of the Transferred Business or the Transferred Assets (including the Facility and the Facility Site) on or after the Closing Date;
> (b) liabilities with respect to the Assumed Obligations and the Assumed Contracts;

> (c) a breach of any representation, warranty or agreement of MEMC or MEMC Pasadena contained in or made pursuant to this Agreement . . . .

12. In its most recent supplemental brief, Albemarle contends that the language in Section 7.4. which states that the section is "[s]ubject to the terms and conditions of this *Article 7"* requires us to read Section 7.4 independently of Articles 3 and 4. To the contrary, we note that the term "subject to the terms and conditions" appears throughout the agreement, and nowhere requires any section to be read in isolation. We also note that Section 7.1 expressly incorporates all other agreements between the parties into Article 7:

> All representations, warranties and agreements made by any party to this Agreement or pursuant hereto shall be true, complete, and correct as of the date hereof and at and as of the Closing Date as though such representations, warranties, covenants and agreements were made at and as of the closing date.

above, Section 3.4 of the agreement does not provide for MEMC to assume an obligation for the indemnity agreement between Albemarle and Ethyl. Additionally, Albemarle's failure to disclose the agreement under Section 4.16, suggests that MEMC was not aware of the agreement. We further noted that Section 4.16(a)(x) suggests that MEMC is not obligated to Albemarle for its payment to Ethyl because it is a "wholly-owned subsidiary" of Ethyl, which would qualify as an "Affiliate of Seller" under the Asset Purchase Agreement.

 Albemarle refers us to decisions that interpret "arising out of" language to require only a causal nexus between the action and the result. For its broad interpretation, Albemarle calls this court's attention to a number of cases construing insurance contracts. *See Mid–Century Ins. Co. of Tex. v. Lindsey,* 997 S.W.2d 153, 156 (Tex.1999); *Utica Nat'l Ins. Co. v. Am. Indem. Co.,* 141 S.W.3d 198, 203 (Tex. 2004); *McCarthy Bros. Co. v. Cont'l Lloyds Ins. Co.,* 7 S.W.3d 725, 730 (Tex. App.-Austin 1999, no pet.); *Gen. Agents Ins. Co. v. Arredondo,* 52 S.W.3d 762, 767 (Tex.App.-San Antonio 2001, pet. denied); *Sport Supply Group, Inc. v. Columbia Cas. Co.,* 335 F.3d 453, 458 (5th Cir.2003). In interpreting an insurance policy, when that policy "is subject to more than one reasonable interpretation, we must adopt the construction most favorable to the insured when we resolve the uncertainty." *State Farm Fire & Cas. Co. v. Vaughan,* 968 S.W.2d 931, 933 (Tex.1998). Albemarle presents no authority that requires us to interpret the terms of contractual indemnity in a commercial setting—terms which neither party contends are subject to multiple reasonable interpretations—to favor the indemnitee.

MEMC relies on an unpublished decision from this Court in *Union Tex. Petro-leum Energy Corp. v. Kelly Operating Co.,* No. 01–96–00346–CV, 1997 WL 476322 (Tex.App.-Houston [1st Dist.] Aug. 21, 1997, no pet.) (not designated for publication). In August 1990, four men were injured by a well and sued Union Texas for negligent dredging of an oil well extension canal that occurred in 1975. *Id.* at *1. Kelly refused to indemnify Union Texas under their May 1990 agreement that provided that Kelly would discharge all obligations arising out of the purchased property with respect to all occurrences on or after the Effective Date of the agreement. *Id.* This Court held that the agreement that provided for indemnity after May 1990 did not apply because the negligent conduct—the 1975 dredging of the oil well—occurred prior to the effective date of the agreement. *Id.* at *3. Here, similarly, the liability, obligation or claim arises from the contractual relationship between Albemarle and Ethyl, which occurred before the Closing Date of the Asset Purchase Agreement. *See id.*

Examining the entire writing in order to give effect to the intent of the parties as expressed in the agreement, and in order to render no clause meaningless, we conclude that the Asset Purchase Agreement does not obligate MEMC to indemnify Albemarle for the payment to Ethyl under the agreement between Albemarle and Ethyl. The trial court therefore erred by granting partial summary judgment for Albemarle, and also erred by failing to grant partial summary judgment in favor of MEMC.

## Conclusion

We reverse and render judgment for MEMC.