**Opinion issued August 4, 2016**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-15-00821-CV

———————————

## CHOICE! POWER, L.P., Appellant

## V.

## MICHAEL FEELEY, Appellee

On Appeal from the 55th District Court
Harris County, Texas
Trial Court Case No. 2013-41124

## O P I N I O N

The trial court found in favor of appellee, Michael Feeley, on his breach of contract claim against appellant, Choice! Power, L.P., and awarded $353,705.57 in damages. In three issues on appeal, Choice argues that the trial court erred in its interpretation of the contract and that the evidence is legally and factually

insufficient to support the trial court's finding of breach of contract.[1]  In his cross-appeal, Feeley argues the trial court erred by granting summary judgment against him on his claim for attorneys' fees.

We affirm.

## Background

In June 2011, Feeley entered into an employment agreement with Choice. Feeley was employed to be a broker for Choice.  The agreement provided that the term of his employment began June 1, 2011, and continued for 54 months.  The agreement also provided, "This Agreement may not be terminated by either party except (i) by Employer for Cause (as defined below) or (ii) by Employee for any material breach of this Agreement by Employer . . . ."  The termination provision lists nine categories of actions by Feeley that would constitute cause for termination. One of those categories permitted termination if Feeley "materially violate[d] any specific written instructions or policies of Employer."  The agreement established that "[t]he Parties understand that this Agreement creates an employment relationship for a term and shall not be construed as creating an 'at will' employment relationship."

---

[1]  Choice raised two additional issues in its brief on the merits concerning mitigation of damages.  In its reply brief, however, Choice withdrew the issues.

When he began working with Choice, Feeley primarily worked on brokering what are known as financially-settled contracts. A smaller portion of his work concerned what are known as physically-settled contracts. During Feeley's employment with Choice, financially-settled contracts were reclassified as futures contracts, pursuant to federal regulations. In order for a broker to work on futures contracts, the broker had to be "Series 3 registered" by a certain date. In order to be Series 3 registered, the broker had to pass the Series 3 examination. Physically-settled contracts were not affected by this change, and brokers for those contracts did not require Series 3 registration.

On September 7, 2011, Choice emailed its brokers about the change in regulations. The email discussed the regulatory changes designating financially-settled contracts as futures and the requirement to pass the Series 3 exam in order to broker futures. The email continued,

> As you know, a broker must be NFA registered in order to orchestrate block/EFS trades. By having all of our employees who broker cleared trades register as Aps, we will eliminate the risk that a non-registered broker will inadvertently enter a block/EFS trade, which could result in significant penalties to both the broker and our firms.

> Obviously, the brokerage of block/EFS trades also represents a significant source of bonus revenue that is not available to non-registered brokers.

> Every OTCGH broker should be NFA registered by the end of this year.

The regulatory deadline to be Series 3 registered subsequently changed. On September 12, 2012, Choice emailed its brokers, again discussing the requirements of the changed regulations. It continued,

> By changing the listing of all swap contracts to futures by the CME and ICE, it has also created a MANDATORY OBLIGATION FOR ALL OTCGH BROKERS TO BE SERIES 3 REGISTERED, ASSOCIATED PERSONS OF OUR INTRODUCING BROKER EOX. Only Series 3 registered Futures Brokers can Broker Futures. If you currently broker natural gas options, crude options, fixed price, basis, PJM, Ercot power etc.-- you have to be a series 3 registered broker.

Choice sent the last email pertinent email on December 17, 2012. The email was brief and said, in pertinent part,

> If you are receiving this email, you have not registered for the series 3 exam and/or previously failed; YOU MUST SCHEDULE AND REGISTER AN EXAM DATE -- PRIOR TO 12/31/2012.

> Subsequently, you must take the text and pass by March 31st.

> If you fail to register for the exam by the end of the year, WE CANNOT EMPLOY YOU TO BROKER FUTURES AS OF 1/1/2013.

The evidence at trial showed that Feeley took the examination three times, but never passed the examination. As a result, Feeley could not take the examination again for six months and could not broker financially-settled contracts for that time. Choice assigned Feeley to work exclusively on physically-settled contracts after that. Specifically, they charged Feeley with developing business in emissions-related contracts. About two months later, Feeley had not succeeded in brokering

4

any physically-settled contracts. Choice terminated Feeley, claiming it was for cause under the employment contract due to Feeley's failure to comply with Choice's instructions to pass the Series 3 examination.

Feeley brought suit against Choice, alleging breach of contract. Feeley also sought to recover his attorneys' fees from Choice. Choice filed a motion for summary judgment on Feeley's claim for attorneys' fees. Choice argued that the plain text of the statute upon which Feeley was relying did not allow recovery of attorneys' fees from Choice because it was a limited partnership. The trial court agreed and granted summary judgment against Feeley on his claim for attorneys' fees.

The parties proceeded to a bench trial on Feeley's breach of contract claim. Following trial, the trial court issued findings of fact and conclusions of law. The trial court's findings included the following:

> 2. Effective June 1, 2011, Feeley signed a new Employment Agreement . . . under which he was employed as a "Broker" . . . . Feeley brokered mostly financially settled power and gas contracts, but nothing in the Employment Agreement limited his employment to just certain types of brokering. . . .
>
> . . . .
>
> 4. . . . Choice sent a September 7, 2011[] e-mail to its employees . . . which stated "Every OTCGH broker should be NFA registered by the end of this year". . . . Subsequent emails from Choice reflect that the eventual deadline was moved to 2013. . . .

5

5. In October of 2012, the financially settled gas and power contracts Choice brokered were reclassified by the Chicago Mercantile Exchange and the Intercontinental Exchange as "futures contracts". . . . Accordingly, brokers of financially settled power and gas contracts were required to become Series 3 registered . . . . To become Series 3 registered, brokers had to take and pass the NFA's Series 3 examination. Physically settled contracts were not impacted by this regulation.

6. Choice sent a September 12, 2012[] e-mail to its brokers . . . stating that [certain stock exchanges] had "created the **MANDATORY OBLIGATION FOR ALL OTCGH BROKERS TO BE SERIES 3 REGISTERED**". . . . The e-mail also states "If you currently broker natural gas options, crude options, fixed price, basis, PJM, Ercot power etc.—you have to be a Series 3 registered broker." The parties and witnesses all agreed that any broker of physical settled contracts (which by regulation were not futures) did not have to pass the Series 3 examination to settle those contracts.

7. Choice's third e-mail to its brokers went out on December 17, 2012. . . . In it, brokers were directed to schedule and register an exam date prior to year end, and "Subsequently, you must take the test and pass by March 31st." Feeley received this email. . . . He did not pass the examination. . . .

8. At trial, Choice argued that the next sentence of the December 17 e-mail did not mean what it plainly says: "If you fail to register for the exam by the end of the year, WE CANNOT EMPLOY YOU TO BROKER FUTURES AS OF 1/1/2013". . . .

. . . .

10. . . . . Feeley failed the examination in January 2013, March 2013[,] and finally on April 29, 2013. Accordingly[,] he was prohibited by [federal] regulations from brokering financially settled gas and power contracts. Further, he could not take the examination again until October 29, 2013.

11. After Feeley's third failure[,] he met with Choice's President, Javier Loya. At this meeting[,] it was clearly communicated to

Feeley that his failure may ultimately result in termination of his employment. Loya testified . . . that Choice had the option to terminate if it could not find another role for an exam failing employee. . . .

12. Feeley's failures did not prevent his working on physical transactions. Choice allowed Feeley to remain and attempt to start a new business desk closing physical transactions, but the effort was ultimately not profitable. . . .

13. Choice terminated Feeley's employment in June 2013 for his failure to pass the Series 3 examination. Loya testified that he might not have been terminated had Feeley been profitable closing physical transactions . . . . Seven other brokers failed to pass the examination but were not terminated for such failure. For example, [one broker] stayed on at Choice as a physical trader, and [another broker] remained as a consultant. Mr. Loya testified that these other employees had different employment agreements, but Choice's general counsel, John Jeffers, testified there was no difference in the contracts which might be the basis for why Feeley was fired and the other seven were not. . . .

## Interpretation of Contract

In its first issue, Choice argues that the trial court erred in its interpretation of the contract.

## A.     Standard of Review

A court should construe an unambiguous contract as a matter of law, and, on appeal, the court's ruling is subject to de novo review. *See J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003); *MEMC Elec. Materials, Inc. v. Albemarle Corp.*, 241 S.W.3d 67, 70–71 (Tex. App.—Houston [1st Dist.] 2007, pet. denied).

7

**B.     Analysis**

The basis for Feeley's breach of contract claim is that the contract allows him to be fired only for cause and that Choice lacked sufficient cause to fire him. Choice argued that it had sufficient cause because the employment agreement defined "cause" to include "materially violat[ing] any specific written instructions or policies of Employer," that it had instructed Feeley to pass a certain test in order to obtain a certificate required to broker certain kinds of contracts, and that Feeley materially violated this instruction by failing to pass the test. The trial court agreed with Feeley that he had not breached this provision of the employment agreement, and Choice appeals that determination.

In construing a written contract, the court's primary concern is to ascertain the true intent of the parties, as expressed in the instrument. *J.M. Davidson, Inc.,* 128 S.W.3d at 229. Usually, the intent of the parties can be discerned from the instrument itself. *ExxonMobil Corp. v. Valence Operating Co.*, 174 S.W.3d 303, 312 (Tex. App.—Houston [1st Dist.] 2005, pet. denied). "Contract terms are given their plain, ordinary, and generally accepted meanings unless the contract itself shows them to be used in a technical or different sense." *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 662 (Tex. 2005). We examine and consider the entire writing in an effort to harmonize and give effect to all provisions so that none is rendered meaningless. *J.M. Davidson, Inc.*, 128 S.W.3d at 229. The court may not

8

consider any single provision, taken in isolation, as controlling, but must consider all provisions in context of the entire instrument. *Id.* Likewise, we construe the terms of a contract to give each word meaning so none will be rendered meaningless. *Alpert v. Riley*, 274 S.W.3d 277, 288 (Tex. App.—Houston [1st Dist.] 2008, pet. denied).

The employment agreement between Choice and Feeley included a termination provision. According to the termination provision, "[t]his Agreement may not be terminated by either party except (i) by Employer for Cause (as defined below) or (ii) by Employee for any material breach of this Agreement by Employer . . . ." The termination provision lists nine categories of actions by Feeley that would constitute cause for termination. Choice relies on one of those categories of actions as its basis for terminating Feeley: "materially violat[ing] any specific written instructions or policies of Employer."

In order to properly interpret this provision, we must place it in the context of the rest of the employment agreement. *See J.M. Davidson*, 128 S.W.3d at 229. Absent an agreement to the contrary, employment is at-will. *Montgomery Cty. Hosp. Dist. v. Brown*, 965 S.W.2d 501, 502 (Tex. 1998). An at-will employee can be fired "for good cause, bad cause, or no cause at all." *Id.* In order to change the employment status from at-will to term, "the employer must unequivocally indicate a definite intent to be bound not to terminate the employee except under clearly

9

specified circumstances." *Id.* General statements or assurances, such as assurances "that an employee will not be discharged as long as his work is satisfactory" are insufficient. *Id.*

Here, the contract evinces an agreement between Choice and Feeley that Feeley would not be an at-will employee. The contract establishes that Feeley would be employed for a term of four and one-half years and establishes the date from which employment begins. Next, the contract has a termination provision, permitting termination only under specified circumstances enumerated in the contract. *See id.* (requiring, in order to avoid classification of employment at-will, agreement to limit termination to clearly specified circumstances). Circumstances constituting cause include, for example, materially breaching the contract, misappropriating funds, securing undisclosed profit from company contracts, and violating rules or regulations governing Choice's business. Finally, the contract contains a provision explicitly stating that the contract "creates an employment relationship for a term and shall not be construed as creating an 'at will' employment relationship." Accordingly, the contract establishes that Feeley's employment agreement was not at-will, and it is within this context we must construe the meaning of the provision at issue.

The ground for termination at issue is "materially violat[ing] any specific written instructions or policies of Employer." Choice argues that the only reasonable

construction of this provision is to interpret it to mean that Choice had "the right to terminate the Agreement for cause if Feeley violate[d] '*any*' of Choice's written instructions or policies with no limitation as to subject matter."  (Emphasis in original.)  Choice asserts that "instruction" can only be construed to "relate to specific tasks [that] are issued by employers from time to time throughout the course of an employee's employment."  Accordingly, under Choice's construction of the provision, Choice could terminate Feeley for failing to follow any instruction given for any task at any time during his employment, without restriction.[2]

Choice's interpretation of this one ground for termination—out of nine grounds—would convert Feeley's employment status to at-will.  *See id.* (requiring limitations to termination to be specific and not general); *Curtis v. Ziff Energy Grp., Ltd.*, 12 S.W.3d 114, 118 (Tex. App.—Houston [14th Dist.] 1999, no pet.) (holding requirement in contract to provide notice for termination but not limiting reasons for termination constitutes at-will employment relationship).  Such a construction would be in contradiction to the employment agreement as a whole and would ignore the contract requirement that a violation must be material.  *See J.M. Davidson*, 128 S.W.3d at 229 (holding courts may not consider any single provision, taken in

---

[2]     By Choice's reasoning, failing to follow the instruction "turn in your resignation" would be sufficient cause to terminate Feeley.

11

isolation, as controlling, but must consider all provisions in context of entire instrument).

Resolution of whether the three emails by Choice constitute a terminable "instruction" as contemplated by Feeley's termination provision is necessarily dependent on context and cannot be determined solely from reviewing the terms of the contract, because the three emails were not part of the parties' agreement. Accordingly, resolution of the remaining question of whether Choice gave Feeley a terminable "instruction" and terminated him for failing to follow that instruction, cannot be resolved through interpretation of the contract.

We overrule Choice's first issue, claiming that the trial court erred in its interpretation of the contract.

## Breach of Contract

In its second issue, Choice argues the evidence is legally insufficient to support the trial court's determination that it fired Feeley without cause. In its third issue, Choice argues the evidence is factually insufficient to support the trial court's determination that it fired Feeley without cause.

## A.     Standards of Review

In an appeal from a bench trial, the trial court's findings of fact have the same weight as a jury verdict. *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994); *Nguyen v. Yovan*, 317 S.W.3d 261, 269–70 (Tex. App.—Houston [1st Dist.] 2009,

pet. denied). When challenged, a trial court's findings of fact are not conclusive if there is a complete reporter's record on appeal. *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 795 (Tex. 2002). We review a trial court's findings of fact under the same legal sufficiency of the evidence standard used when determining whether sufficient evidence exists to support an answer to a jury question. *See Catalina*, 881 S.W.2d at 297; *Nguyen*, 317 S.W.3d at 269–70.

An appellant may not challenge a trial court's conclusions of law for factual sufficiency, but we may review the legal conclusions drawn from the facts to determine their correctness. *See BMC Software*, 83 S.W.3d at 794. In an appeal from a bench trial, we review the conclusions of law de novo and will uphold them if the judgment can be sustained on any legal theory supported by the evidence. *See id.* "If the reviewing court determines a conclusion of law is erroneous, but the trial court rendered the proper judgment, the erroneous conclusion of law does not require reversal." *Id.*

When considering whether legally sufficient evidence supports a challenged finding, we must consider the evidence that favors the finding if a reasonable fact finder could, and disregard contrary evidence unless a reasonable fact finder could not. *See City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). We view the evidence in the light most favorable to a finding and indulge every reasonable inference to support it. *Id.* at 822. We may not sustain a legal sufficiency, or "no

13

evidence," point unless the record demonstrates (1) a complete absence of evidence of a vital fact; (2) that the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) that the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) that the evidence conclusively establishes the opposite of the vital fact. *Id.* at 810. Because it acts as the fact finder in a bench trial, the trial court is the sole judge of the credibility of witnesses and the weight to be given to their testimony. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003). As long as the evidence at trial "would enable reasonable and fair-minded people to differ in their conclusions," we will not substitute our judgment for that of the fact finder. *City of Keller*, 168 S.W.3d at 822.

When it attacks the legal sufficiency of an adverse finding on an issue on which it has the burden of proof, the appellant must demonstrate on appeal that the evidence establishes, as a matter of law, all vital facts in support of the issue. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001). In reviewing a "matter of law" challenge, the reviewing court must first examine the record for evidence that supports the finding, while ignoring all evidence to the contrary. *Id.* If there is no evidence to support the finding, the reviewing court will then examine the entire record to determine if the contrary proposition is established as a matter of law. *Id.*

14

The point of error should be sustained only if the contrary proposition is conclusively established. *Id.*

In a factual sufficiency review, we consider and weigh all of the evidence. *See Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *Arias v. Brookstone, L.P.*, 265 S.W.3d 459, 468 (Tex. App.—Houston [1st Dist.] 2007, pet. denied). When the appellant challenges an adverse finding on an issue on which it did not have the burden of proof at trial, we set aside the verdict only if the evidence supporting the finding is so weak as to make the verdict clearly wrong and manifestly unjust. *See Cain*, 709 S.W.2d at 176; *Reliant Energy Servs., Inc. v. Cotton Valley Compression, L.L.C.*, 336 S.W.3d 764, 782 (Tex. App.—Houston [1st Dist.] 2011, no pet.). When it challenges an adverse finding on an issue on which it had the burden of proof at trial, the appellant must demonstrate on appeal that the adverse finding is against the great weight and preponderance of the evidence. *Dow Chem.*, 46 S.W.3d at 242; *Reliant Energy Servs., Inc.*, 336 S.W.3d at 782.

## B.    Analysis

Choice's second and third issues challenge the trial court's determination of breach of contract. When an employee can only be fired for cause, the employer bears the burden of proving sufficient cause. *Lee-Wright, Inc. v. Hall*, 840 S.W.2d 572, 578 (Tex. App.—Houston [1st Dist.] 1992, no writ); *Pinnacle Anesthesia Consultants, P.A. v. Fisher*, 309 S.W.3d 93, 99 (Tex. App.—Dallas 2009, pet.

denied); *see also McGee v. Abrams Tech. Services, Inc.*, No. 01-06-00590-CV, 2008 WL 597192, at *3 (Tex. App.—Houston [1st Dist.] Mar. 6, 2008, no pet.) (mem. op.) (same, applying *Lee-Wright*). Accordingly, to prevail on its legal-sufficiency challenge, Choice must establish that there is no evidence in support of the trial court's findings and that the contrary proposition is established as a matter of law. *See Dow Chem.*, 46 S.W.3d at 241. To prevail on its factual-sufficiency challenge, Choice must establish that the adverse finding is against the great weight and preponderance of the evidence. *See id.* at 242.

Choice argues that the statements in the emails identified by the trial court amounted to instructions, which Feeley violated. Choice relies on three emails to establish that it gave a terminable instruction to Feeley.[3]

The first email discussed the regulatory changes designating financially-settled contracts as futures and the requirement to pass the Series 3 exam in order to broker futures. The letter continued,

> As you know, a broker must be NFA registered in order to orchestrate block/EFS trades. By having all of our employees who broker cleared trades register as Aps, we will eliminate the risk that a non-registered broker will inadvertently enter a block/EFS trade, which could result in significant penalties to both the broker and our firms.

---

[3] Feeley does not argue that the people who sent the email lacked the authority to give him a terminable instruction. Accordingly, we assume for purposes of this appeal that the people sending the emails had the proper authority.

16

Obviously, the brokerage of block/EFS trades also represents a significant source of bonus revenue that is not available to non-registered brokers.

Every OTCGH broker should be NFA registered by the end of this year.

The next email came over a year later, as the deadline to pass the Series 3 exam had been extended. This email also discussed the requirements of the changed regulations. It continued,

By changing the listing of all swap contracts to futures by the CME and ICE, it has also created a MANDATORY OBLIGATION FOR ALL OTCGH BROKERS TO BE SERIES 3 REGISTERED, ASSOCIATED PERSONS OF OUR INTRODUCING BROKER EOX. Only Series 3 registered Futures Brokers can Broker Futures. If you currently broker natural gas options, crude options, fixed price, basis, PJM, Ercot power etc.-- you have to be a series 3 registered broker.

The last email came about three months later. The email was brief and said, in pertinent part,

If you are receiving this email, you have not registered for the series 3 exam and/or previously failed; YOU MUST SCHEDULE AND REGISTER AN EXAM DATE -- PRIOR TO 12/31/2012.

Subsequently, you must take the text and pass by March 31st.

If you fail to register for the exam by the end of the year, WE CANNOT EMPLOY YOU TO BROKER FUTURES AS OF 1/1/2013.

Choice argues these emails amounted to an instruction: take and pass the Series 3 exam. Feeley's failure to take and pass the test, Choice argues, amounts to a violation of the instruction that Choice gave.

17

In contrast, the trial court found that the implication from the emails was that "[f]ailure to pass the examination meant Choice could not employ that person 'to broker futures'. . . . The regulations, Choice's e-mails, and the testimony of the witnesses all concur that failure to pass the examination only restricts the broker relating to futures." There is evidence to support the trial court's view of these emails. *See City of Keller*, 168 S.W.3d at 822 (requiring appellate courts to view evidence in light most favorable to verdict and to indulge every reasonable inference to support it).

As the trial court found, Feeley's employment contract did not restrict him to working on only financially-settled contracts. He was employed as a broker. Choice engaged in brokering physically-settled contracts as well as financially-settled contracts, and Feeley had brokered physically-settled contracts in the past. It was undisputed that, after failing to become Series 3 registered, Feeley could and did work on physically-settled contracts.

Likewise, the first two emails were sent to all of Choice's brokers. The contents of the emails were not tailored to Feeley, specifically. The record also showed that other brokers did not pass the Series 3 exam and were not terminated. The trial court could have reasonably construed this to mean that Choice did not intend these emails to be blanket requirements.

The last email was sent to only a specific group of brokers: those who had not taken or had taken but not passed the exam. Even so, that email specifically provided that failure to pass would only mean they could not be employed "to broker futures." This is consistent with the trial court's view that the email was not sent as an instruction whose violation could result in Feeley's termination, but as a clarification that failing to pass the exam would exclude the broker from brokering financially-settled contracts.

The trial court further found that Feeley was actually terminated because he was not profitable, which is not a permissible ground for termination under Feeley's contract. Choice argues that "Feeley's unprofitability was caused by his failure to comply with Choice's written instructions" and that, accordingly, Feeley's unprofitability provided support for Choice's stated ground for termination. Because we have held that there was support in the record for the trial court's finding that the emails did not constitute terminable instructions, however, Feeley's subsequent unprofitability cannot justify terminating him on this ground.

Choice argues that there is evidence to support its view of the events and their ramifications: that the emails constituted direct, terminable instructions; that Feeley violated the instructions; that Feeley became unprofitable as a result; and that it terminated Feeley for violating its instruction to pass the Series 3 exam. Whether there is evidence to support Choice's preferred view is not the relevant inquiry,

19

however. For a legal-sufficiency challenge, Choice bears the burden on appeal to establish that there is no evidence in support of the trial court's findings and that the contrary proposition is established as a matter of law. *See Dow Chem.*, 46 S.W.3d at 241. For a factual-sufficiency challenge, Choice bears the burden to establish that the adverse finding is against the great weight and preponderance of the evidence. *See id.* at 242. There is sufficient evidence in the record to legally and factually support the trial court's findings and conclusions that Feeley was terminated not because of his failure to pass the tests but because he was not profitable and that Choice failed to carry its burden at trial of proving that Feeley materially violated a specific written instruction of Choice, as that phrase is used in the employment contract. *See BMC Software*, 83 S.W.3d at 795 (requiring affirming judgment if it can be sustained on any legal theory supported by evidence).

We overrule Choice's second and third issues.

### Attorneys' Fees

In his sole issue on cross-appeal, Feeley argues the trial court erred by granting summary judgment against him on his claim for attorneys' fees. The summary judgment was based on the statutory interpretation of section 38.001 of the Civil Practice and Remedies Code. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 38.001 (Vernon 2015).

20

**A.      Standard of Review & Applicable Law**

We review questions of statutory construction de novo. *Molinet v. Kimbrell*, 356 S.W.3d 407, 411 (Tex. 2011). Our fundamental objective in interpreting a statute is "to determine and give effect to the Legislature's intent." *Am. Zurich Ins. Co. v. Samudio*, 370 S.W.3d 363, 368 (Tex. 2012); *accord* TEX. GOV'T CODE ANN. § 312.005 (Vernon 2013). "The plain language of a statute is the surest guide to the Legislature's intent." *Prairie View A & M Univ. v. Chatha*, 381 S.W.3d 500, 507 (Tex. 2012).

We presume that the Legislature chooses a statute's language with care, including each word chosen for a purpose, while purposefully omitting words not chosen. *TGS-NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 439 (Tex. 2011). When statutory text is clear, it is determinative of legislative intent, unless enforcing the plain meaning of the statute's words would produce an absurd result. *Entergy Gulf States, Inc. v. Summers*, 282 S.W.3d 433, 437 (Tex. 2009). The words of the statute cannot be examined in isolation but must be construed based on the context in which they are used. *TGS–NOPEC*, 340 S.W.3d at 441.

**B.      Analysis**

Each party to litigation is responsible for the costs of its attorneys' fees unless an award of attorneys' fees is statutorily authorized. *Epps v. Fowler*, 351 S.W.3d 862, 865 (Tex. 2011). Section 38.001 of the Civil Practice and Remedies Code

authorizes an award of attorneys' fees for certain enumerated classes of claims brought by a "person" against "an individual or corporation." CIV. PRAC. & REM. § 38.001. Choice argued in its motion for summary judgment that, as a limited partnership, it was neither an individual nor a corporation and, accordingly, Feeley could not recover attorneys' fees against it. The trial court agreed and rendered summary judgment.

The Fourteenth Court of Appeals recently addressed the question of whether a party can recover attorneys' fees under section 38.001 from a limited liability partnership. *Fleming & Assocs., L.L.P. v. Barton*, 425 S.W.3d 560, 574–576 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). It noted that the predecessor to section 38.001[4] "provided that 'any person, corporation, partnership, or other legal entity' could recover fees from a 'person or corporation.'" *Id.* at 575 (citing Gregory Scott Crespi, *Who Is Liable for Attorney's Fees Under Texas Civil Practice & Remedies Code Section 38.001 in Breach of Contract Litigation?*, 65 SMU L. REV. 71, 73 (Winter 2012)).

Crespi's article, cited in *Fleming*, discusses the history in the change of the text during the enactment of section 38.001. 65 SMU L. REV. at 72–74. Crespi points out that the enactment of section 38.001 was only intended "to recodify the

---

[4] Section 38.001 became effective September 1, 1985. *See* Act of May 17, 1985, 69th Leg., R.S., ch. 959, §§ 1, 11, 1985 Tex. Gen. Laws 3242, 3278, 3322 (codified at TEX. CIV. PRAC. & REM. CODE ANN. § 38.001).

22

preexisting law in this area and not to introduce any substantive changes." *Id.* at 73 (citing *Lake LBJ Mun. Util. Dist. v. Coulson*, 839 S.W.2d 880, 891 (Tex. App.—Austin 1992, no writ)); *see also* Act of May 17, 1985, 69th Leg., R.S., ch. 959, § 10, 1985 Tex. Gen. Laws 3242, 3322 (declaring enactment of Civil Practice and Remedies Code was "intended as a recodification only, and no substantive change in the law is intended by this Act"). Nevertheless, the text of the statute changed.

Crespi notes that, prior to the enactment of section 38.001, the courts had interpreted the predecessor statute to exclude recovery of attorneys' fees from a governmental entity. 65 SMU L. REV. at 74; *see also Hous. Auth. of City of Dallas v. Hubbell*, 325 S.W.2d 880, 906 (Tex. Civ. App.—Dallas 1959, writ ref'd n.r.e.). The Civil Practice and Remedies Code, however, had incorporated the definitions of the Code Construction Act. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 1.002 (Vernon Supp. 2015) ("The Code Construction Act (Chapter 311, Government Code) applies to the construction of each provision in this code, except as otherwise expressly provided by this code."). The Code Construction Act defines a person to include a governmental entity. *See* TEX. GOV'T CODE ANN. § 311.005(2) (Vernon 2013).

The revisor's notes indicate that the Legislature changed "person" to "individual" for the class of entities against whom attorneys' fees could be recovered in order to prevent governmental entities from being included in that class. *See*

Crespi, 65 SMU L. Rᴇᴠ. at 73–74; Cɪᴠ. Pʀᴀᴄ. & Rᴇᴍ. § 38.001 revisor's note 2[5] ("The revised law does not use 'person' in the reference to an opposing party because the Code Construction Act definition of 'person' is broader than the source law meaning of the term.").

While it defines "person," the Code Construction Act does not define "individual" or "corporation." *Fleming*, 425 S.W.3d at 575. "When a statute contains undefined terms, the ordinary meanings of these terms should be applied." *Id.* (citing *Tijerina v. City of Tyler*, 846 S.W.2d 825, 827 (Tex. 1992)); *see also* Tᴇx. Gᴏᴠ'ᴛ Cᴏᴅᴇ Aɴɴ. § 311.011(a) (Vernon 2013) ("Words and phrases shall be read in context and construed according to the rules of grammar and common usage."). The court in *Fleming* held that the ordinary meaning of "individual" and "corporation" did not include "any type of partnership." 425 S.W.3d at 575. The court recognized that the revisor's notes indicated that the enactment of section 38.001 was not intended to create a substantive change in the law. *Id.* "'But general statements by the Legislature that "no substantive change in the law is intended" must be considered with the clear, specific language used' in section 38.001." *Id.* (quoting *Fleming Foods of Tex., Inc. v. Rylander*, 6 S.W.3d 278, 284 (Tex. 1999)).

---

[5] Accessed through Texas Legislative Reference Library, http://www.lrl.state.tx.us/scanned/statutoryRevision/RevisorsReports/Civil_Practice_and_Remedies/Civil%20Practice%20and%20Remedies%20Code_Chapters_1_to_51.pdf (last accessed May 17, 2016).

"[W]hen, as here, specific provisions of a 'nonsubstantive' codification and the code as a whole are direct, [are] unambiguous, and cannot be reconciled with prior law, the codification rather than the prior, repealed statute must be given effect." *Fleming Foods*, 6 S.W.3d at 286.

The Fourteenth Court of Appeals concluded that, despite the assertion that no substantive changes were intended by enacting section 38.001, the unambiguous language of the section demonstrated that a substantive change had, in fact, occurred. *Fleming*, 425 S.W.3d at 575–76. Accordingly, the court held that section 38.001 did not permit recovery of attorneys' fees from any kind of partnership. *See id.* at 576.

Feeley argues that "corporation" can be understood to be a generic term, applying to multiple kinds of business entities, including limited partnerships. In support of this, Feeley cites to the American Heritage Dictionary's definition of "corporation." *See Corporation*, AM. HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (5th ed. 2015)[6] ("An entity such as a business, municipality, or organization, that involves more than one person but that has met the legal requirements to operate as a single person, so that it may enter into contracts and engage in transactions under its own identity.").

---

[6] Accessed through the American Heritage Dictionary of the English Language, https://ahdictionary.com/word/search.html?q=corporation (last accessed May 17, 2016).

25

Courts can look to the dictionary definition of a word to determine the ordinary meaning of the word. *See, e.g.*, *RSUI Indem. Co. v. The Lynd Co.*, 466 S.W.3d 113, 124 (Tex. 2015) (considering dictionary definition of "individually," "collectively," "each," and "all"). Even so, "[w]ords and phrases that have acquired a technical or particular meaning, whether by legislative definition or otherwise, shall be construed accordingly." GOV'T § 311.011(b). The word "corporation" has a definite, statutorily-defined meaning in Texas. *See* TEX. BUS. ORGS. CODE ANN. §§ 1.002(14), 20.001–23.110 (Vernon Supp. 2015); *see also Corporation*, Black's Law Dictionary (9th ed. 2009) ("An entity (usu. a business) having authority under law to act as a single person distinct from *the shareholders who own it* and having *rights to issue stock* and exist indefinitely" (emphasis added)).

Additionally, the use of the word "corporation" has remained the same from the predecessor statute to the current section 38.001. Courts have interpreted this word and have construed it to mean a corporation specifically, not a generic term for any type of business. *See Hubbell*, 325 S.W.2d at 906; *see also State v. Cent. Power & Light Co.*, 161 S.W.2d 766, 768 (Tex. 1942) ("[A]s a general rule the word 'corporation' is construed to apply only to private corporations and does not include municipal corporations, unless the statute expressly so provides."). After enactment of section 38.001, the Texas Supreme Court interpreted "corporation" under the predecessor statute to include both private and municipal corporations. *Gates v. City*

26

*of Dallas*, 704 S.W.2d 737, 740 (Tex. 1986). Even while expanding the broader interpretation, however, the court still maintained a narrower construction of corporation than found in general-purpose dictionaries. *See id.* Accordingly, the law does not support Feeley's proposed more extensive interpretation.

Feeley further argues that interpreting section 38.001 to exclude other legal entities would lead to absurd results. The bar for concluding a plain-faced interpretation of a statute would lead to absurd results "is high[] and should be." *Combs v. Health Care Services Corp.*, 401 S.W.3d 623, 630 (Tex. 2013). "The absurdity safety valve is reserved for truly exceptional cases, and mere oddity does not equal absurdity." *Id.* Unintended, improvident, inequitable, over-inclusive, or under-inclusive consequences of a statute is not proof of absurd results. *Id.* Instead, we can only find absurd results if we find "it was quite impossible that a rational Legislature could have intended it." *Id.* at 631.

Here, the revisor's notes to section 38.001 indicate that the Legislature modified the words used in section 38.001 in order to preserve the precedent of excluding governmental entities from the class of parties against whom attorneys' fees could be recovered. *See* Crespi, 65 SMU L. REV. at 73–74; CIV. PRAC. & REM. § 38.001 revisor's note 2. In doing so, the Legislature excluded from that class other legal entities against whom the predecessor statute had allowed attorneys' fees to be recovered. *See Fleming*, 425 S.W.3d at 575. Even if we concluded that the broader

effects of this change were unintended or under-inclusive, we could not conclude that application of the statute according to its plain meaning would lead to an absurd result. *See Combs*, 401 S.W.3d at 630; *see also Greco v. Nat'l Football League*, 116 F. Supp. 3d 744, 752 (N.D. Tex. 2015) (holding plain-faced interpretation of section 38.001 does not lead to absurd results).

We hold that section 38.001 of the Civil Practice and Remedies Code does not permit recovery against a limited partnership. We overrule Feeley's sole issue.

## Conclusion

We affirm the trial court's judgment.


Laura Carter Higley
Justice

Panel consists of Justices Higley, Bland, and Brown.

28